OCEAN TRANSPORT, INC., et al., Appellants,

v.

GREYCAS, INC., et al., Appellees.

No. 13–92–453–CV.

Court of Appeals of Texas, Corpus Christi.

May 26, 1994.

Rehearing Overruled June 30, 1994.

---

1. Kutnick's original report addressed both appellant's competency and his sanity at the time of the offense.

James R. Harris, J. Norman Thomas, Andrew M. Greenwell, Harris & Thomas, Corpus Christi, for appellants.

C. Michael Clark, Johnson & Dylewski, Houston, David T. Maddox, Fennemore Craiz, Phoenix, Lee Casstevens, David Atnip, Gregory T. Perkes, Wood, Burney, Cohn & Viles, Corpus Christi, Jerald Gibbs, Calvin, Dylewski, Gibbs, Johnson & Verner, Houston, for appellees.

Before DORSEY, PAUL W. NYE,[1] and GILBERTO HINOJOSA, JJ.

## OPINION

GILBERTO HINOJOSA, Justice.

This appeal involves a deficiency suit asserted by Greycas, Inc., against appellants on a $3.1 million promissory note secured by two first preferred ship mortgages on two barges. Appellants filed a counterclaim against appellees for usury and violations of the Texas Deceptive Trade Practices–Consumer Protection Act (the DTPA),[2] and appellees filed counterclaims against appellants for their attorneys fees. The trial was to a jury which found that $250,000 was the unpaid balance due and owing upon the promissory note. It also made an affirmative finding that the interest rate on the note was calculable. It made no awards to appellees on their claims for attorneys fees. The trial court entered a take-nothing judgment against appellants on all of their claims, and it ordered that Greycas recover $250,000 against appellants.

Appellants appeal by five points of error, Greycas, Inc., raises three cross-points of error, Greyhound Financial Corporation (GFC) raises nine cross-points of error, and Dial Corporation raises four cross-points of error. We reverse and remand in part and as reformed, we affirm in part.

Greycas, Inc., was a corporation listed as the lender on the $3.1 million promissory note. GFC was a corporate entity that allegedly owned 100% of Greycas's stock. Appellants alleged that Greycas was the *alter ego* of GFC, the Dial Corporation, f/k/a the Greyhound Corporation, or both.

In 1979, Lawrence Kieschnick and William Cross, both certified public accountants, learned of the economic need for ocean-going barges. Kieschnick had legal counsel set up a corporation called Ocean Transport, Inc., and a Texas limited partnership called Ocean Transport Ltd. No. 1 (the Partnership). Kieschnick and Cross each owned 50% of Ocean Transport, and Ocean Transport was the general partner in the Partnership. Other persons had invested money into the Partnership as well. The intent was that the Partnership would make money leasing two ocean-going barges to companies that ferried equipment and supplies to offshore oil rigs.

In November 1980, Kieschnick signed two contracts with St. Augustine Shipbuilding to make two barges at $1,925,000 a piece. On April 14, 1981, Kieschnick, Cross, and Ocean Transport (collectively the Guarantors)

1. Former Chief Justice, retired April 30, 1993.

2. *See* Tex.Bus. & Com.Code Ann. §§ 17.41–17.63 (Vernon 1987 & Supp.1994).

agreed to unconditionally guaranty payment by the Partnership of all its obligations, including the payment of all sums that may become due to Greycas from the Partnership.

On April 21, 1981, Greycas and the Partnership entered into a commitment letter in which Greycas agreed to lend the Partnership $3.1 million. Appellants took the commitment letter to Texas Commerce Bank (TCB) and borrowed $2,825,000 to pay for the construction costs of the two barges. The TCB loans were due on June 30, 1982. On that date, Kieschnick signed a promissory note on the Partnership's behalf in which the Partnership borrowed $3.1 million from Greycas. The funds were paid to TCB in order to pay off the construction loans on the two barges. The note provided for 180 monthly installments of $53,096.80 (principal and interest combined) and one final $620,000 payment at the end of the specified 15–year term of the note. The first installment was due on the closing date (June 30, 1982). Two first preferred ship mortgages (one on each barge) secured the financing on the June 30, 1982 note.

Soon after the barges became ready for work, the oil and gas industry declined, and the Partnership was not able to earn enough money from leasing the barges to make all of its loan payments. Greycas sent the Partnership a notice of default, and it accelerated maturity of the promissory note. Greycas called upon the Guarantors to honor their guarantee agreements.

The Guarantors were not able to pay the balance due. The barges were turned over to Greycas in June 1986, and on October 27, 1986, a federal judge signed a judgment against the barges *in rem* (the Federal Court Judgment). The court ordered a judgment favorable to Greycas for $4,268,616.24, "plus interest thereon at the rate of $1,649.00 per diem from March 4, 1986 through even date herewith, plus interest from even date herewith at the legal rate until paid." On November 14, 1986, the barges were sold to Greycas at a federal marshal's sale for $5,000 a piece. That amount ($10,000) was applied to the amount owing at the time. In July 1988, Greycas resold the barges for $670,000, less a $25,000 brokerage commission. The net proceeds of $645,000 were applied to the indebtedness existing at the time of the marshal's sale.

On February 26, 1990, Greycas filed a deficiency suit in the 148th Judicial District Court of Nueces County, Texas against the Guarantors. Appellants responded with a counterclaim against Greycas, GFC, and Dial for usury as well as other causes of action. On May 7, 1990, the trial court granted Greycas's motion for a nonsuit of its deficiency claim. On April 1, 1991, Greycas refiled its deficiency suit as a counterclaim against the Guarantors and the Partnership. Appellants then amended their counterclaim to include violations of the DTPA. In response, appellees filed counterclaims against appellants, alleging that their DTPA claims were groundless and brought in bad faith, or for the purpose of harassment. They requested attorneys fees for defending the DTPA claims.

### Appellants' Points of Error

■ By point three, appellants complain that the trial court erred when it overruled their motion to strike appellees' expert witnesses because they were not timely designated and no showing of good cause was made. In October 1990, the trial court signed an agreed docket control order which stated that counsel for appellees, Greycas and GFC, had to designate experts by April 3, 1991. In May 1991, the trial court signed an agreed order which amended the docket control order and stated that the deadline for appellees' designation of experts was September 23, 1991. In a letter dated September 23, 1991, appellants' counsel informed Dial's counsel that "we agree to allow you to supplement your experts designation by September 26 1991 . . . ." On September 27, 1991, Dial designated Greg Smalis as an expert, and Greycas and GFC listed Smalis and Joe P. Dove as experts.

Appellants requested that the trial court strike Smalis and Dove as expert witnesses. The trial court overruled the motion, and they were allowed to testify at trial.

Appellants argue that rules 215(5) and 166b(6)(b) of the Texas Rules of Civil Proce-

**262**

dure govern the disposition of this point. They contend that appellees' failure to timely designate Smalis and Dove should have led to the automatic exclusion of their testimony, unless they made a showing of good cause for its admission. We disagree.

Rule 166 of the Texas Rules of Civil Procedure relates to pre-trial conferences. The rule provides for an order to be made at the pre-trial conference hearing, and that "such order when issued shall control the subsequent course of the action, unless modified at the trial to prevent manifest injustice." TEX. R.CIV.P. 166. Rule 166 recognizes the fundamental rule that a trial court has the inherent right to change or modify any interlocutory order or judgment down to the time the judgment on the merits in the case becomes final. *Hill v. W.E. Brittain, Inc.*, 405 S.W.2d 803, 808 (Tex.Civ.App.—Fort Worth 1966, no writ); *Bachman Center Corp. v. Sale*, 359 S.W.2d 290, 292 (Tex.Civ.App.—Dallas 1962, writ ref'd n.r.e.); *Sneed v. Martin*, 292 S.W.2d 891, 894 (Tex.Civ.App.—Dallas 1956, no writ). *See Carrizales v. Wal–Mart Stores, Inc.*, 794 S.W.2d 129, 130 (Tex.App.—Fort Worth 1990, writ denied). In the instant case, appellees had designated their expert witnesses no later than September 27, 1991, and voir dire examination began in December 1991. By overruling the motion to strike, the trial court implicitly modified the docket control order. The modification occurred before the judgment became final. We hold that the trial court did not abuse its inherent right to change or modify the docket control order. Furthermore, because the designation of the expert witnesses occurred more than 30 days before trial, rules 215(5) and 166b(6)(b) do not apply. We find no abuse of discretion. The point of error is overruled.

### Standard of Review

■ Several of the following points of error involve challenges to the factual and legal sufficiency of the evidence. In determining a no evidence point, we consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *Larson v. Cook Consultants, Inc.*, 690 S.W.2d

567, 568 (Tex.1985); *International Armament Corp. v. King*, 686 S.W.2d 595, 597 (Tex.1985); *In re King's Estate*, 244 S.W.2d 660, 661–62 (Tex.1951). If any evidence of probative force exists to support the finding of the jury, we must overrule the point and uphold the finding. *In re King's Estate*, 244 S.W.2d at 661–62.

■ If an appellant is attacking the legal sufficiency of an adverse finding on an issue on which he had the burden of proof, he must show that the evidence conclusively established all vital facts in support of the issue. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982). In reviewing a "matter of law" challenge, we use a two-prong test. We first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Sterner*, 767 S.W.2d at 690; *Holley*, 629 S.W.2d at 696. If no evidence exists to support the finding, the reviewing court will examine the entire record to determine if the contrary proposition is established as a matter of law. *Sterner*, 767 S.W.2d at 690; *Holley*, 629 S.W.2d at 696–97. If the evidence conclusively establishes the contrary proposition, the point of error will be sustained. *Meyerland Community Improvement Ass'n v. Temple*, 700 S.W.2d 263, 267 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

■ In reviewing an insufficiency of the evidence challenge, we consider, weigh, and examine all of the evidence that supports and that is contrary to the jury's determination. *Sosa v. City of Balch Springs*, 772 S.W.2d 71, 72 (Tex.1989); *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside the verdict only if the evidence standing alone is so weak that it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985).

■ In reviewing a challenge that the jury finding is against the great weight and preponderance of the evidence, we must examine the entire record to determine if some evidence exists to support the finding, if the finding is so contrary to the overwhelming weight and preponderance of the evidence

that it is clearly wrong and manifestly unjust, or if the great preponderance of the evidence supports its nonexistence. *See Cain,* 709 S.W.2d at 176; *Dyson,* 692 S.W.2d at 457; *In re King's Estate,* 244 S.W.2d at 661. If we conclude that the finding or non-finding is against the great weight and preponderance of the evidence, we may reverse and remand the case for a new trial. *Ames v. Ames,* 776 S.W.2d 154, 158 (Tex.1989); *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651 (Tex.1988).

■ By point one, appellants complain that the principal rate of interest under the provisions of the promissory note was incalculable as a matter of law, or, alternatively, no evidence of the interest rate being calculable exists. We interpret this point as a no evidence or insufficient evidence point of error.

Appellants' contention is that the calculability of the interest rate is a question of law for the trial court, and that the interest rate is incalculable as a matter of law. Alternatively, they argue that even if the matter of calculability was a jury issue, appellees offered no evidence to show that a rate was calculable under the provisions in the loan documents. They argue that because the interest rate of the promissory note was incalculable as a matter of law, or, alternatively, appellees offered no evidence of calculability of the interest rate, an issue in which appellees had the burden of proof, the parties did not agree to a rate of interest. Therefore, the Texas legal rate of six percent per annum governs the transaction.[3] They claim that any amounts contracted for, charged, or received which are in excess of the six percent legal rate constituted usurious charges. The request this court to reverse the take-nothing judgment on their usury claim and remand the case to the trial court for the calculation of damages.[4]

Usury is defined as "interest in excess of the amount allowed by law." TEX.REV.CIV. STAT.ANN. art. 5069–1.01(d) (Vernon 1987). "When no specified rate of interest is *agreed upon by the parties,*" the rate shall be six percent. TEX.REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987) (emphasis added). If a specified rate is agreed upon, the parties may contract "for *any* index, formula, or provision of law, by or under which the numerical rate or amount can *from time to time be determined....*" TEX.REV.CIV.STAT.ANN. art. 5069–1.04(f) (Vernon 1987) (emphasis added). We turn to the central issue of whether an agreement on the interest rate existed and whether it was to a specific numerical rate or index.

Special Question 1 asked, "Did the parties to the closing documents agree to a calculable rate of interest on $3,100,000.00 on June 30, 1982?" The jury answered affirmatively.

The promissory note does not state a specific interest rate that Greycas charged the Partnership. The note, however, does give a formula to determine the interest rate:

Ocean Transport Limited No. 1 ("Borrower") ... unconditionally promises to pay to the order of Greycas, Inc. ("Lender") ... the principal sum of $3,100,000.00 advanced by Lender pursuant to the terms of a Loan and Security Agreement dated as of April 14, 1981, between Borrower and

---

3. TEX.REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987) provides:
    When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

4. TEX.REV.CIV.STAT.ANN. art. 5069–1.06 (Vernon 1987) provides:
    (1) Any person who contracts for, charges or receives interest which is greater than the amount authorized by this Subtitle, [footnote omitted] shall forfeit to the obligor three times the amount of usurious interest contracted for,

charged or received, such usurious interest being the amount the total interest contracted for, charged, or received exceeds the amount of interest allowed by law, and reasonable attorney fees fixed by the court except that in no event shall the amount forfeited be less than Two Thousand Dollars or twenty percent of the principal, whichever is the smaller sum....
    (2) Any person who contracts for, charges or receives interest which is in excess of double the amount of interest allowed by this Subtitle shall forfeit as an additional penalty, all principal as well as interest and all other charges and shall pay reasonable attorney fees set by the court....

Lender ("Loan Agreement"), in 181 monthly installments of principal and interest combined, ("Installments") 180 of which shall equal 1.7128% ("Payment Factor") of the face amount of this Promissory Note the first such installment shall be due and payable on the date hereof, and the next 179 installments being due and payable on the same day (or if none, the last day) of each successive month thereafter, and one final installment ("Final Installment") in the amount of $620,000.00 being due and payable at the end of the 180th month....

The loan and security agreement (Agreement) provided that the regular monthly installments had been quoted based upon a Moody's Average of 15.27.[5] These installments were subject to adjustment on the closing date. On that date, the applicable Moody's Average was the mean of the most recent three weeks' Moody's Average. The parties were to refer to Exhibit F attached to the Agreement to determine the payment factor set forth thereon next to the applicable Moody's Average. The note shows that the payment factor was 1.7128%.

Appellant Lawrence Kieschnick's testimony showed that the first payment on the loan was due on the closing date. During trial, his counsel asked him, "[U]sing the words that the Greyhound people put in this note, is there any way that you can calculate an interest rate when they say that you are paying interest on the very day you get the money?" He replied, "No, sir, you cannot compute the interest rate. It's impossible."

W. Scott Turner, a certified public accountant, testified that a person could not compute the interest on the note's first payment because the first payment was a loan for zero days. He said that a person could not compute an interest rate in accordance with the terms of the note.

Greycas called at least four witnesses who testified that they could calculate the interest rate on the promissory note. Joseph McCusker, who had worked as a GFC marketing manager, calculated the interest rate in the promissory note by looking only at the face of the note. He determined that the interest rate was 20.04%. He arrived at his calculation by using a calculator, but he indicated that, given time, he could make the calculation by hand.

Gregory Smalis and Sandra McDonough, who had worked for GFC, also calculated the interest rate at 20.04%.

Joe Dove, a certified public accountant, calculated the interest rate in the note at 20.04%. He also testified that the amount of interest on the first month's payment was zero. He indicated that zero interest on the first payment did not prevent calculation of the note's annual interest rate.

By submitting Special Question 1 to the jury, the trial court determined that the note was ambiguous. *See Neece v. A.A.A. Realty Co.,* 159 Tex. 403, 322 S.W.2d 597, 599 (1959) (by submitting issues to the jury designed to ascertain the parties' agreement, "the trial judge evidently considered that the written instrument was ambiguous"). Therefore, the jury had to resolve the ambiguity of whether the interest rate was calculable or incalculable. We find evidence to support the jury's finding that the interest rate was calculable. Therefore, the six percent ceiling applicable absent an agreement does not bind Greycas in this case. *See* TEX.REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987).

■ By this same point of error, appellants complain that the overdue rate of interest in the promissory note was not calculable as a matter of law and that the guarantee agreements were usurious. **1. The Overdue Rate.**

Appellants argue that the overdue rate of interest under the promissory note is incalculable as a matter of law. The loan and security agreement provided that an overdue rate applied to amounts overdue under the terms of the promissory note and defined the rate as:

> a rate ("Overdue Rate") equal to the lesser of (i) the maximum legal rate of interest permitted by applicable law or (ii) 5% per annum above [ ("Prime") ] the announced

---

**5.** Moody's Average referred to the corporate bond yield average for Baa rated public utilities compiled and published by Moody's Investors Service, Inc.

base rate of interest charged by Citibank, N.A. on 90 day loans to responsible and substantial commercial borrowers in effect from time to time (but not less than the % per annum set forth in Supplement 1) computed on the basis of the actual number of days elapsed using a 360-day year, payable on demand. . . .

Appellants point out that the "maximum legal rate of interest permitted by applicable law" and the Citibank base rate were required to calculate the overdue rate. They argue that if any one of these two rates is incalculable or indeterminable, no agreement existed concerning the rate of interest, and the legal rate of six percent per annum applies. TEX.REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987). They also argue that from the face of the loan documents, they cannot determine the "maximum legal rate of interest permitted by applicable law." We disagree with appellants' arguments.

Article 5069–1.01 to –1.12 generally sets the maximum rates of interest that may be contracted for, charged or received in this state.[6] The "maximum legal rate of interest permitted by applicable law" and the Citibank base rate were the specified rates agreed upon, and they were referenced to a determinative source, which could be made certain by proof. *See Rent America, Inc. v. Amarillo Nat'l Bank*, 785 S.W.2d 190, 194 (Tex.App.—Amarillo 1990, writ denied); *Dale Oil & Refining Co. v. City of Tulia*, 25 S.W.2d 671, 674 (Tex.Civ.App.—Amarillo 1930, no writ). The fact that a third party's (Citibank's) prime rate determined the over-

due rate in this case does not render the obligation unenforceable, for that was the standard the parties agreed to use to ascertain the rate of interest on the note. *See Rent America*, 785 S.W.2d at 194–95; *Penwell v. Barrett*, 724 S.W.2d 902, 905 (Tex. App.—San Antonio 1987, no writ).

Sandra McDonough, a GFC assistant vice-president, calculated the daily interest on the unpaid principal due on the promissory note at a twelve and one-half percent rate. She used that rate because it was Citibank prime, plus five percent. She stated that the other rate which she could have applied, according to the loan and security agreement, was 18%. She used Citibank prime, plus five percent because that was the lower rate.

Appellants introduced evidence challenging McDonough's calculations. We hold that the overdue rate in the promissory note was not incalculable as a matter of law. **2. The Guarantee Agreements.**

Appellants argue that the guarantee agreements were usurious in at least two ways. First, they provided that the guarantors had "primary, direct and immediate" liability for "all obligations" accruing under the various loan documents governing the relationship between Greycas and the Partnership and "all amounts due" thereunder. Thus, the guarantors' obligations included the obligations to pay usurious interest under the terms of the loan documents. We disagree with this contention. We have already held that the loan documents were not usurious.

---

**6.** Articles 5069–1.02 and 1.04 govern the maximum rates of interest allowable under Texas law. Article 5069–1.02 provides:

Except as otherwise fixed by law, the maximum rate of interest shall be ten percent per annum. A greater rate of interest than ten percent per annum unless otherwise authorized by law shall be deemed usurious. All contracts for usury are contrary to public policy and shall be subject to the appropriate penalties proscribed in Article 1.06 of this Subtitle.

Article 5069–1.04 provides in part:

(a) The parties to any written contract may agree to and stipulate for any rate of interest . . . that does not exceed:

(1) an indicated rate ceiling that is the auction average rate quoted on a bank discount basis for 26–week treasury bills issued by the United States government, as published by the Federal Reserve Board, for the week preceding the week in which the rate is contracted for, multiplied by two, and rounded to the nearest one-quarter of one percent; or, as an alternative,

(2) an annualized or quarterly ceiling that is the average of the computations under Subsection (1) of this section and is computed pursuant to Section (d) of this Article.

(b)(1) If a computation under Section (a)(1), (a)(2), or (c) of this Article is less than 18 percent a year, the ceiling under that provision is 18 percent a year. If a computation under Section (a)(1), (a)(2), or (c) of this Article is more than 24 percent a year, the ceiling under that provision is 24 percent a year.

TEX.REV.CIV.STAT.ANN. arts. 5069–1.02, 1.04 (Vernon 1987).

Second, appellants argue that the guarantee agreements were usurious because they provided for an incalculable rate of interest on interest (called the "Overdue Rate") on all past-due amounts. In this case, the corporate guarantee agreement provided that "[i]n the event that the Guarantor should fail or decline to pay any sums properly due Greycas hereunder within 10 days following Greycas' request for the payment of any such sums, then said sums shall bear interest at the Overdue Rate (as defined in the Agreement).... " The individual guarantee agreements provided that "[i]n the event that the Guarantors should fail or decline to pay any sums properly due Greyhound hereunder within 5 days following Greyhound's request for the payment of any such sums, then said sums shall bear interest at the Overdue Rate (as defined in the Agreement).... " The loan and security agreement, *supra,* defined the overdue rates stated in the guarantee agreements. We have already held that this overdue rate was not incalculable as a matter of law. We overrule the point of error.

■ By point four, appellants complain that the four-year statute of limitations barred Greycas's deficiency suit. Their contention is that the Texas statute of limitations provides that a person bringing a suit on a note must bring it within four years after the day the cause of action accrued. They say that Greycas's cause of action under the note and guarantee agreements accrued on March 14, 1986 when it accelerated the indebtedness, making it fully due and payable. Thus, the limitations period expired on March 14, 1990. Appellees contend that claims arising under the Ship Mortgage Act are not subject to a limitations period, and that the equitable doctrine of laches governs the timeliness of these claims.

The Partnership executed the two preferred ship mortgages in accordance with the Ship Mortgage Act of 1920 [7] (the Act). The Act governed a creditor's right to a deficien-

cy judgment following foreclosure of a preferred ship mortgage. *Walter E. Heller & Co. v. O/S Sonny V.,* 595 F.2d 968, 971 (5th Cir.1979). The Act provided that upon default, the mortgagee may bring an *in rem* suit in admiralty to enforce the lien, and that the United States district courts have exclusive jurisdiction over all *in rem* actions under the Act. 46 U.S.C. § 951 (West 1975). The mortgagee may also bring suit *in personam* in admiralty against the mortgagor for the "amount of the outstanding mortgage indebtedness secured by such vessel or any deficiency in the full payment thereof." 46 U.S.C. § 954(a) (West 1975).

■ State and federal courts have concurrent jurisdiction over *in personam* actions under § 954 of the Act. *Reedsburg Bank v. Apollo,* 508 F.2d 995, 999 (7th Cir.1975). In *J. Ray McDermott & Co. v. Vessel Morning Star,*[8] the court stated that while state law may occasionally "fill the gaps in an incomplete and less than perfect maritime system," the "Ship Mortgage Act, when read together with [§ 2001 of the judicial sales act [9]] forms a comprehensive procedure for the foreclosure of a preferred ship's mortgage, the sale of the vessel and any resulting deficiency adjudged against the debtor *in personam.*" *McDermott,* 457 F.2d at 818.

■ A federal limitations statute did not govern deficiency suits under the Act. *See* 46 U.S.C. § 954(a) (West 1975); *see also Waterways Marine, Inc. v. Brooks Liquid Transp., Inc.,* 291 F.Supp. 703, 704 (N.D.Ill. 1968); *United States v. American Gas Screw Franz Joseph,* 210 F.Supp. 581, 584 (D.Alaska 1962).[10] In the absence of any specific limitation in the federal statute creating a cause of action, the rule of limitation is to be found in the statutes of the state where the suit is brought. 54 C.J.S. *Limitations of Actions* § 31 (1987).

---

**7.** 46 U.S.C. §§ 911–984 (West 1975). In 1988 (effective January 1, 1989), the Ship Mortgage Act was extensively amended and recodified.

**8.** 457 F.2d 815, 818 (5th Cir.1972), *cert. denied,* 409 U.S. 948, 93 S.Ct. 271, 34 L.Ed.2d 218 (1972).

**9.** *See* 28 U.S.C. §§ 2001–2007 (West 1994).

**10.** In *Waterways* and *American Gas Screw,* laches applied in federal court.

■ The statute of limitations is an affirmative defense. Tex.R.Civ.P. 94. The defendant bears the initial burden to plead, prove, and secure findings to sustain its plea of limitations. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex.1988).

■ Section 16.004(a)(3) of the Texas Civil Practice and Remedies Code provides that a person must bring suit on a debt no later than four years after the day the cause of action accrues. Tex.Civ.Prac. & Rem. Code Ann. § 16.004(a)(3) (Vernon 1986). The question of when a cause of action accrues is a question of law for the court to decide. *Moreno v. Sterling Drug*, 787 S.W.2d 348, 351 (Tex.1990). A cause of action generally accrues at the time when facts come into existence which authorize a claimant to seek a judicial remedy. *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990); *Hartman v. Hartman*, 138 S.W.2d 802, 803 (Tex.Comm'n App.1940, opinion adopted). If demand is an integral part of a cause of action or a condition precedent to the right to sue, the statute of limitations does not begin to run until demand is made, unless the demand is waived or unreasonably delayed. *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *Gabriel v. Alhabbal*, 618 S.W.2d 894, 896 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). In this case, Greycas sought judgment against the Partnership pursuant to the loan documents, and against the Guarantors pursuant to their guarantee agreements, jointly and severally. The promissory note provided in part:

> Upon default in the prompt and full payment of any Installment of this Promissory Note, or upon the occurrence of any Event of Default or upon the occurrence of a Total Loss, Lender [Greycas, Inc.] *may, at its option, declare this Promissory Note to be immediately due and payable, whereupon this Promissory Note shall become immediately due and payable* and Borrower [Ocean Transport Limited No. 1] shall immediately pay to Lender the "Unpaid Amount" of this Promissory Note....

(emphasis supplied). Don Luttenegger, GFC's vice-president for operations control,

testified about a memo dated March 14, 1986 and sent to William Cross (one of the Guarantors) at or about that date. He stated that the memo's purpose was to accelerate the loan. Thus, March 14, 1986, was the promissory note's declaration date, and the four-year limitations' period began to run on that date. Greycas filed its deficiency suit on February 26, 1990. The suit remained on file 70 days before Greycas non-suited the claim on May 7, 1990. Greycas refiled the deficiency suit on April 1, 1991. However, even taking into account the 70–day period in which limitations was tolled, Greycas did not refile its deficiency suit until after limitations ran in the Partnership's favor.

### Did Limitations Bar the Deficiency Suit Against the Guarantors?

■ In situations where a lender can sue a guarantor without first suing the maker, the guarantor cannot defend an action to recover on a contract of guaranty by showing that the statute of limitations barred the claim against the maker. *Wiman v. Tomaszewicz*, 877 S.W.2d 1, 5 (Tex.App.—Dallas, 1994, n.w.h.); *Beddall v. Reader's Wholesale Distribs., Inc.*, 408 S.W.2d 237, 240 (Tex.Civ. App.—Houston 1966, no writ); *see also Willis v. Chowning*, 90 Tex. 617, 40 S.W. 395, 396–97 (1897); *Western Casket Co. v. Estrada*, 116 S.W. 113, 113–14 (Tex.Civ.App.—El Paso 1909, no writ). When this occurs, the operation of the statute of limitations on the principal obligation does not of itself affect the undertaking of a guarantor and is not a defense available to the guarantor unless it has also operated on his own promise of guaranty. *Wiman*, at 5, 6. *Beddall*, 408 S.W.2d at 240; *see also Charbonneau v. Bouvet*, 98 Tex. 167, 82 S.W. 460 (1904).

■ In this case, the guarantee agreements provided in relevant part that the Guarantors' liability was:

> primary, direct and immediate. Guarantor[s] ... agree that neither (i) the exercise or the failure to exercise by Greycas [or Greyhound] of any rights or remedies conferred on it.... (ii) the recovery of a judgment against Borrower or Obligor. (iii) the commencement of an action at law

or the recovery of a judgment at law against Borrower or any Obligor and the enforcement thereof ... shall extinguish or affect the obligations of Guarantor[s] hereunder....

Thus, Greycas could sue the Guarantors without first suing the Partnership, and the Guarantors could not defend the suit on the basis that limitations barred the suit against the Partnership. *See Wiman,* at 5; *Beddall,* 408 S.W.2d at 240.

■ In determining when Greycas's cause of action against the Guarantors began to accrue for purposes of the statute of limitations, we look at the terms of the guarantees. *See Vastine v. Bank of Dallas,* 808 S.W.2d 463, 464 (Tex.1991); *FDIC v. Attayi,* 745 S.W.2d 939, 944 (Tex.App.—Houston [1st Dist.] 1988, no writ). Kieschnick's and Cross's guarantee agreement stated in part:

> Guarantors hereby covenant and agree unconditionally that in case of an Event of Default (as defined in the Agreement or the Mortgage), *within 5 days of the receipt of written notice* from or on behalf of Greyhound to the effect that there exists such an Event of Default and of the amount or obligations which Borrower has failed to pay or perform. Guarantors will pay the entire unpaid amount thereof to Greyhound....

Ocean Transport's guarantee agreement stated in part:

> Guarantor covenants and agrees unconditionally that, in case of an Event of Default (as defined in the Agreement or the Mortgage) *within 5 days of the receipt of written notice* from or on behalf of Greycas to the effect that there exists such an Event of Default and of the amount or obligations which Borrower has failed to pay or perform, Guarantor will pay the entire unpaid amount to Greycas....

■ These guarantee agreements required the Guarantors to pay "within 5 days of the receipt of written notice" that event of default exists and the amount which the Partnership had failed to pay.

Concerning Ocean Transport's liability under its guarantee agreement, it received written notice of an event of default on November 26, 1985. The notice did not state the amount the Partnership had failed to pay; however, the Partnership's written notice of default,[11] received on November 25, 1985, showed that past due installments amounted to $1,696,721.90. Thus, limitations began to run on December 1, 1985 (November 26, 1985 plus five days). Limitations expired favorable to Ocean Transport on December 1, 1989. Greycas initially filed suit on February 26, 1990, well after the four-year limitations' period ran in Ocean Transport's favor.

■ Concerning Kieschnick's and Cross's liability under their guarantee agreement, we cannot determine the *exact date* they received written notice of the event of default; therefore, we do not know when limitations accrued. We hold that Kieschnick and Cross did not meet their initial burden to prove their plea of limitations. *See Woods,* 769 S.W.2d at 517. We sustain point four to the extent that limitation barred Greycas's deficiency suit against the Partnership and Ocean Transport. We overrule point four to the extent that limitations did not bar Greycas's deficiency suit against Kieschnick and Cross.

■ By point two, appellants complain that the trial court erred when it denied their right to initiate voir dire, make the initial opening statement, open and close in the introduction of evidence, and open and close in final summation. Appellants' posture is that they became the plaintiffs after Greycas non-suited its deficiency claim. Greycas argues that in the absence of an order designating appellants as plaintiffs, it remained the plaintiff in the case.

Rule 265 of the Texas Rules of Civil Procedure provides in part:

> The trial of cases before a jury shall proceed in the following order unless the

designated to Lawrence Kieschnick as president.

---

**11.** Ocean Transport's notice and the Partnership's notice were sent to the same address and

court should, for good cause stated in the record, otherwise direct:

(a) The party upon whom rests the burden of proof *on the whole case* shall state to the jury briefly the nature of his claim or defense and what said party expects to prove and the relief sought. Immediately thereafter, the adverse party may make a similar statement, and intervenors and other parties will be accorded similar rights in the order determined by the court.

(b) The party upon whom rests the burden of proof *on the whole case* shall then introduce his evidence.

(c) The adverse party shall briefly state the nature of his claim or defense and what said party expects to prove and the relief sought unless he has already done so.

(d) He shall then introduce his evidence.

(e) The intervenor and other parties shall make their statement, unless they have already done so, and shall introduce their evidence.

TEX.R.CIV.P. 265. (emphasis supplied). Rule 266 provides in part: "Except as provided in Rule 269 the plaintiff shall have the right to open and conclude both in adducing his evidence and in the argument, unless the burden of proof *on the whole case* under the pleadings rests upon the defendant...." TEX.R.CIV.P. 266. (emphasis supplied). Rule 269 provides in part:

(a) After the evidence is concluded and the charge is read, the parties may argue the case to the jury. The party having the burden of proof *on the whole case,* or on all matters which are submitted by the charge, shall be entitled to open and conclude the argument; where there are several parties having separate claims or defenses, the court shall prescribe the order of argument between them.

TEX.R.CIV.P. 269. (emphasis supplied).

■ A presiding trial judge has broad discretion with respect to the manner in which control of a trial is maintained, and an appellate court will not reverse a judgment for error relating to that area unless probable prejudice is shown. *Texas Employers' Ins. Ass'n v. Garza,* 557 S.W.2d 843, 845 (Tex.Civ.App.—Corpus Christi 1977, writ

ref'd n.r.e.). An appellate court may reverse a trial court for abuse of discretion only if, after searching the record, it clearly shows that the trial court's decision was arbitrary and unreasonable. *Simon v. York Crane & Rigging Co.,* 739 S.W.2d 793, 795 (Tex.1987); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). This court is required to view the evidence in the light most favorable to the trial court's action, and indulge in every presumption which would favor the trial court's action. *Adams v. Reagan,* 791 S.W.2d 284, 287 (Tex.App.—Fort Worth 1990, no writ); *Parks v. U.S. Home Corp.,* 652 S.W.2d 479, 485 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd).

In the instant case, appellants did not have the burden of proof *on the whole case.* Greycas had to prove its entitlement to a deficiency, along with the attorneys fees it allegedly expended in prosecuting the suit. The record does not clearly show that the trial court's decision was arbitrary and unreasonable. We hold that the trial court did not abuse its discretion when it denied appellants the opportunity to initiate voir dire, make the initial opening statement, open and close in the introduction of evidence, and open and close in final summation. *See Garza,* 557 S.W.2d at 845; TEX.R.CIV.P. 265, 266 & 269. The point of error is overruled.

■ By point five, appellants complain that the trial court erred when it rendered a judgment which did not specify a post-judgment interest rate. The judgment ordered "that post-judgment interest shall accrue on the judgment hereby rendered at the highest legal rate from today's date until paid." Article 5069–1.05 § 1 provides:

All judgments of the courts of this state based on a contract that provides for a *specific rate of interest* earn interest at a rate equal to the lesser of:

(1) the rate specified in the contract; or

(2) 18 percent.

TEX.REV.CIV.STAT.ANN. art. 5069–1.05 § 1 (Vernon Supp.1994). (emphasis supplied). Article 5069–1.05, section 3(b) provides that "[e]ach judgment shall state the rate of inter-

est to be earned on that judgment." TEX. REV.CIV.STAT.ANN. art. 5069–1.05 § 3(b) (Vernon Supp.1994).

By finding that the interest rate was calculable, the jury implicitly found that the rate was 20.04%. Therefore, we will apply the lesser of the two rates which is the statutory rate of 18%. We sustain the point of error, and reform the judgment to show that post-judgment interest shall accrue at 18% from the judgment date until paid.

### GFC's and Dial's Cross–Points of Error

■ GFC and Dial bring cross-points of error complaining that the trial court erred in refusing to find that appellants' DTPA claims were groundless and brought in bad faith, or for the purpose of harassment. They also bring cross-points of error complaining that the jury's failure to award attorneys fees to them for defending appellants' DTPA claims was against the great weight and preponderance of the evidence.

■ Section 17.50(c) of the DTPA provides that "[o]n a finding by the court that an action under this section was groundless and brought in bad faith, or brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorneys' fees and court costs." TEX. BUS. & COM.CODE ANN. § 17.50(c) (Vernon 1987). "Groundless" under the DTPA has the same meaning as "groundless" under Rule 13 of the Texas Rules of Civil Procedure: "[N]o basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." TEX.R.CIV.P. 13. *Donwerth v. Preston II Chrysler–Dodge, Inc.,* 775 S.W.2d 634, 637 (Tex.1989). The proper standard for determining whether a case is groundless for purposes of § 17.50(c) is whether the totality of the tendered evidence demonstrates an *arguable basis in fact and law* for the consumer's claim. *Splettstosser v. Myer,* 779 S.W.2d 806, 808 (Tex.1989); *Donwerth,* 775 S.W.2d at 637. To prove "bad faith," appellees must have shown that a malicious or discriminatory purpose motivated appellants' claims. *Central Texas Hardware, Inc.*

*v. First City, Texas,* 810 S.W.2d 234, 236 (Tex.App.—Houston [14th Dist.] 1991, writ denied); *Knebel v. Port Enter., Inc.,* 760 S.W.2d 829, 831 (Tex.App.—Corpus Christi 1988, writ denied).

■ Appellate review of a trial court determination that a party's action was groundless, brought in bad faith, or brought for the purpose of harassment is a question of law under an abuse of discretion standard. *Donwerth,* 775 S.W.2d at 637 n. 3. We will apply the law for determining abuse of discretion as stated in appellants' second point of error.

Appellants' DTPA claim asserted, in part, that at the closing of the loan transaction, appellees began a course of action designed to renege on the loan commitment, or to force appellants to agree to material changes in the loan commitment without consideration. Appellants further alleged that appellees were in a superior bargaining position and forced the loan to close without furnishing the proper documents in order to arrive at a calculable interest rate. Due to financial pressure, appellants had no choice but to sign the closing papers. Appellants claimed that in order to extract more interest from them, William Porteous, who was representing Greycas and GFC, had them sign additional agreements.

Appellant Lawrence Kieschnick testified that in the commitment letter between the Partnership and Greycas, Greycas committed itself to a promissory note of 181 installments of principal and interest combined. The first payment was due and payable one month from the closing date. However, when Kieschnick and William Porteous met on the closing date to sign the loan papers, the note that Porteous gave him to sign was different than the one in the commitment letter. The note which Kieschnick signed on the closing date provided that the first installment was due that day. According to Kieschnick, the payment made on the closing date was actually the "very last payment" being made first. He stated that the economic effect of making the very last payment first was a little more than $1,046,000 extra dollars to Greycas.[12] Kieschnick did not negotiate this

---

12. Kieschnick calculated that $53,000 (the $53,- 096.80 payment rounded off) at 20% interest (the

change. If he wanted to pay off the TCB loans, which were due on the closing date, he had to sign the note that day. Porteous allegedly did not advise him that Greycas had made a change in the terms of the note.

■ GFC and Dial raise several barriers which they complain prevent appellants from recovering on their DTPA claims. Therefore, they argue that appellants' DTPA claims were groundless and brought in bad faith, or for the purpose of harassment and that they are entitled to their attorneys fees expended in defending the claims. Their chief contention is that appellants were not consumers under the DTPA. In *Melody Home Mfg. Co. v. Barnes,*[13] the supreme court stated that DTPA plaintiffs must qualify as consumers, as that term is defined in § 17.45(4) of the DTPA[14] to maintain a private cause of action under § 17.50 of the Act. To establish DTPA consumer status, a plaintiff must have sought or acquired goods or services by purchase or lease, and the goods or services purchased or leased must form the basis of the complaint. *Barnes,* 741 S.W.2d at 351–52; *Johnson v. DeLay,* 809 S.W.2d 552, 554 (Tex.App.—Corpus Christi 1991, writ denied). A plaintiff establishes its standing as a consumer by the terms of its relationship to a transaction, and not by a contractual relationship with the defendant. *Kennedy v. Sale,* 689 S.W.2d 890, 893 (Tex. 1985); *Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705, 707 (Tex.1983).

The core of appellees' argument is that borrowed money is neither a "good" nor a "service" that confers consumer status upon a party who sought or acquired the funds; consequently, the loan transaction in this case lies outside the DTPA. *See Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169 (Tex. 1980).[15] They also argue that even if the Partnership, as the borrower, had a good-faith argument to change the law in *Riverside,* the Guarantors do not have a DTPA claim since they were not seeking money. *See First S. Sav. Ass'n v. First S. Partners, II, Ltd.,* 957 F.2d 174, 177 (5th Cir.1992).

However, the supreme court stated in *La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558 (Tex.1984), that a borrower may subject a lender to a DTPA claim if the borrower's "objective" is the purchase or lease of a good or service thereby qualifying the borrower as a consumer. *La Sara Grain,* 673 S.W.2d at 567. In the instant case, the commitment letter states that the sole purpose of the $3.1 million loan was the "acquisition" of the two barges. The corporate guarantee agreement between Ocean Transport and Greycas provided that Greycas "will make the Loan (as defined in the [loan and security] Agreement)[16] to Borrower" and that "Guarantor [Ocean Transport] is an affiliate of Borrower ... and will benefit from the execution and delivery of the Agreement by and between Borrower and Greycas and the making of the Loan...." This guarantee agreement also provided that Greycas was willing to enter into the loan and security agreement with the Partnership only if Ocean Transport agreed to act as a guarantor. The guarantee agreement between Greycas and Kieschnick and Cross provided that they would "benefit from the

contract rate of 20.04% rounded off) over the 15-year lifetime of the note yielded $1,046,000. Other evidence also supported this calculation.

**13.** 741 S.W.2d 349, 351 (Tex.1987).

**14.** Section 17.45(4) provides in pertinent part: " 'Consumer' means an individual, partnership, corporation ... who seeks or acquires by purchase or lease, any goods or services...."

**15.** In *Riverside,* the question was whether a party who seeks a loan from a bank in order to refinance a car qualified as a "consumer" under the DTPA. The supreme court found that Lewis, the borrower, was not a "consumer" in the transaction and denied recovery under the DTPA. Since its holding in *Riverside,* the supreme court has twice limited the case to its facts, emphasizing

that Lewis sought only the extension of credit from Riverside, and nothing more. *See La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 566 (Tex.1984).

**16.** Greycas and the Partnership entered into the "LOAN AND SECURITY AGREEMENT" on April 14, 1981. This agreement provided that "Lender [Greycas] hereby agrees to lend to Borrower [the Partnership] and Borrower agrees to borrow from Lender the sum ("Loan") set forth on Supplement 1 annexed hereto and made a part hereof in accordance with the terms and conditions of this Agreement...." The loan referred to in Supplement 1 was the $3.1 million loan.

execution and delivery of the [loan and security] Agreement between" the Partnership and Greycas "by virtue of their interest in" the Partnership. The guarantee agreement provided that Greycas would enter into the loan and security agreement only if Kieschnick and Cross agreed to act as guarantors.

The Guarantors, by way of the guarantee agreements, had a relationship to the loan transaction, the objective of which was the acquisition of two barges. The Guarantors, along with the Partnership, have an arguable basis in law and fact to assert their DTPA claims against appellees. *See Kennedy,* 689 S.W.2d at 893; *La Sara Grain,* 673 S.W.2d at 567; *Flenniken,* 661 S.W.2d at 707.

GFC and Dial argue that appellants did not "seek" or "acquire" anything from them even if they were consumers. The evidence showed that Kieschnick dealt with GFC in order to obtain financing for the two barges. Other evidence showed that Dial controlled the policies of GFC. Thus, appellants sought and acquired financial assistance from GFC, and that a unity existed between GFC and Dial. This gives appellants an arguable basis in law and fact to support their DTPA claims against GFC and Dial.

GFC and Dial further argue that the Ship Mortgage Act preempted appellant's DTPA claims thereby making their DTPA claims brought in bad faith. They cite as authority *Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577 (5th Cir.1986). *Coastal Iron* does not say that the Ship Mortgage Act preempts the DTPA. Although state law may supplement maritime law when maritime law is silent,[17] or when a local matter is at issue,[18] a court may not apply state law when it would conflict with maritime law. *Powell v. Offshore Navigation, Inc.,* 644 F.2d 1063, 1065 (5th Cir.1981), *cert. denied,* 454 U.S. 972, 102 S.Ct. 521, 70 L.Ed.2d 391 (1981). In the instant case, appellants' DTPA claims involve the loan's structure and events surrounding its closing. These particular claims do not conflict with the provisions of the Ship Mortgage Act. *See* 46 U.S.C.

§§ 911–984 (West 1975). Therefore, there was an arguable basis in law and fact that the Ship Mortgage Act did not preempt appellants' DTPA claims.

GFC and Dial argue that limitations barred appellants' DTPA claims. Section 17.565 of the DTPA provides in part:

> All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice....

TEX.BUS. & COM.CODE ANN. § 17.565 (Vernon 1987).

■ A counterclaim under the DTPA is a statutory cause of action designed to deter deceptive practices by compensating consumers for their actual damages. *MBank Fort Worth, N.A. v. Trans Meridian, Inc.,* 820 F.2d 716, 720 (5th Cir.1987). In *Trans Meridian,* the court stated that a borrower could assert a DTPA claim as a defense to a lender's claim even when limitations barred the borrower's affirmative claim under the Act. *Trans Meridian,* 820 F.2d at 720–21. Appellants have an arguable basis in law and fact that limitations did not bar their DTPA claims.

■ GFC and Dial argue that appellant's DTPA claims had no legitimate chance of success based upon the special questions which appellants tendered for submission. However, groundlessness is not determined based upon the special questions tendered for submission. *See Splettstosser,* 779 S.W.2d at 808; *Donwerth,* 775 S.W.2d at 637.

■ GFC's and Dial's final contention is that appellants' DTPA claims were filed without proper advance written notice to GFC. Section 17.505 of the DTPA provides in part:

> (a) As a prerequisite to filing a suit seeking damages under Subdivision (1) of

---

17. *Continental Oil Co. v. Bonanza Corp.,* 677 F.2d 455, 461 (5th Cir.1982), *on rehearing,* 706 F.2d 1365 (1983) (en banc).

18. *Kamani v. Port of Houston Auth.,* 702 F.2d 612, 614 (5th Cir.1983).

Subsection (b) of Section 17.50 of this subchapter against any person, a consumer shall give written notice to the person at least 60 days before filing the suit advising the person in reasonable detail of the consumer's specific complaint and the amount of actual damages and expenses, including attorneys' fees, if any, reasonably incurred by the consumer in asserting the claim against the defendant....

TEX.BUS. & COM.CODE ANN. § 17.505(a) (Vernon Supp.1994). Section 17.505(b) provides in part that "if the consumer's claim is asserted by way of counterclaim, the notice provided for in Subsection (a) of this section is not required...." TEX.BUS. & COM.CODE ANN. § 17.505(b) (Vernon Supp.1994). Appellants' DTPA claims were filed as part of a counterclaim to Greycas's deficiency suit. Notice was not required. *See* TEX.BUS. & COM.CODE ANN. § 17.505(b) (Vernon Supp. 1994).

We hold that the totality of the tendered evidence demonstrates an arguable basis in fact and law for appellants' DTPA claims. The trial court did not abuse its discretion when it found that appellants' DTPA claims were not groundless, brought in bad faith, or for the purpose of harassment. *See Splettstosser*, 779 S.W.2d at 808; *Donwerth*, 775 S.W.2d at 637. After weighing and considering all the evidence, we find that the jury's failure to award attorneys fees on appellees' DTPA claims was not so against the great weight and preponderance of the evidence that it was manifestly unjust. The cross-points of error are overruled.

### Greycas's Cross–Points of Error

■ By cross-points one and two, Greycas argues that the great weight and preponderance of the evidence does not support the jury's finding that $250,000 was the unpaid balance due and owing upon the promissory note and ask us to render judgment that $3,670,860.95 [19] was the amount due and owing because it was established as a matter of law.

Special Question 28 asked, "What sum of money, if any, do you find is the unpaid balance due and owing upon the promissory note signed on June 30, 1982 as amended on January 10, 1983, less all credits and offsets due?" The jury was asked to include both principal and interest in its answer, as well as all credits and offsets due to the borrower. They awarded $250,000. The trial court ordered that Greycas recover $250,000 against appellants.

Greycas maintains that at the date of the federal marshal's sale of the two barges (November 14, 1986), the sum of $4,670,860.95 was due and payable, less any credit for the "fair market value" of the vessels which collateralized the loan. The jury, in response to Special Question 21, found that $1 million was the market value of the two barges on November 14, 1986. Greycas argues that as a matter of law, the sum due and payable on the note as of the date of the marshal's sale, less all credits and offsets due, was $3,670,-860.95 ($4,670,860.95 − $1,000,000), plus interest at the rate of $1,274.60 *per diem* until the date of judgment, and post-judgment interest at the judgment rate.

Sandra McDonough, the assistant vice-president for the GFC, testified that she had calculated the total amount owing on the promissory note. Her calculations were admitted into evidence as Exhibits 161 and 162. Exhibit 162 showed that on the date of the marshal's sale, $4,670,860.95 was due on the note. This figure included the $4,268,616.24 principal awarded to Greycas in the Federal Court Judgment,[20] plus interest to the date of the marshal's sale. She said that letters of credit had been applied to the indebtedness on December 11, 1985.[21] Her calcula-

---

19. They state that interest accrued at the rate of $1,274.60 *per diem* until the date of judgment and that post-judgment interest accrued at the judgment rate thereafter. *See* TEX.REV.CIV.STAT. ANN. art. 5069–1.05 (Vernon Supp.1994).

20. Exhibit 161 shows how Sandra McDonough arrived at this figure.

21. Exhibit 161 shows that Sandra McDonough applied letters of credit in the amount of $1,101,-980 in arriving at the $4,268,616.94 figure. The loan and security agreement provided that the Partnership, as the borrower, was to deliver to Greycas, as the lender, an irrevocable letter of credit payable to Greycas in the sum of $1,100,-000 or 35.48% of the loan, whichever was less.

tions in Exhibit 162 showed that interest accrued at the rate of $1,394.40 *per diem* beginning November 15, 1986.[22] She testified that the $1,394.40 *per diem* figure was based upon twelve and one-half percent interest which was Citibank prime, plus five percent.

Appellants argue that some evidence of offsets and credits existed to reduce the $4,268,616.24 figure and support the jury finding that $250,000 was the amount due and owing on the promissory note. The evidence supporting these alleged offsets and credits follows: W. Scott Turner, the certified public accountant, testified that Greycas applied the wrong payment factor in the promissory note.[23] He stated that Greycas should have used a 1.6993% payment factor instead of the 1.7128% payment factor. The 1.6993% payment factor would have yielded a monthly installment of $52,678.30. By using the 1.7128% payment factor, Greycas received a $468,894.74 benefit over the term of the note.

They point to Lawrence Kieschnick's testimony which showed that the effect of making the "very last payment" first on the promissory note resulted in a $1,046,000 benefit to Greycas. A finding, however, does not exist that anything was wrong with the contract in this case. It was thus binding on the parties. Appellees could, under the contract, apply the last payment first and use the 1.7128% payment factor.

They also point to appellant William Cross's identification of Defendants' Exhibit 19. Exhibit 19 is a schedule of payments from the Partnership to Greycas. According to the exhibit, the Partnership paid $384,-353.60 to Greycas. However, we cannot determine whether he applied this amount to the amount due and owing on the promissory note.

Appellants maintain that Greycas could have leased the barges while it had them in its possession. Don Luttenegger, GFC's vice-president for operations control, indicat-

ed that Greycas had the two barges for two years before it sold them. (The barges were sold in 1988.) He said that Greycas attempted to rent them, but no market existed for them. However, David Murphy, a barge businessman, testified that he was affiliated with a barge company which did $300,000 in barge business in 1988. It originally had three barges and sold one of them in October 1988. We cannot determine whether Greycas could have leased the barges involved in this suit, or how much money it could have obtained through leasing them.

There is evidence of offsets and credits totalling $1,899,248.30. The record is not clear whether or not *these* offsets and credits were already deducted from the $3,670,860.95 figure claimed as a deficiency. Either way, however, the deficiency would be significantly greater than $250,000. Thus, the jury finding of $250,000 was too low. We hold that the evidence is insufficient to support the jury's award of $250,000. We remand this part of the case to the trial court for a new trial on the issue expressed in Special Question 28. We sustain Greycas's first and second cross-points of error.

■ By cross-point three, Greycas complains that the jury's failure to award attorneys fees was against the great weight and preponderance of the evidence. Special Question 29 asked, "What is a reasonable fee, if any, for the necessary services of the attorneys Greycas, Inc. retained in this case to enforce the promissory note signed on June 30, 1982 as amended on January 10, 1983?" The jury was asked to make awards for (a) preparation and trial, (b) appeal to the court of appeals, (c) making or responding to an application for writ of error to the Texas Supreme Court, and (d) if the Texas Supreme Court granted an application for writ of error. The jury did not award attorneys fees in response to Special Question 29.

Corpus Christi attorney Gary Norton testified for appellees as an expert on attorneys fees in this case. He confined his testimony

---

**22.** This interest amount was not based on the $3,670,860.95 figure. Sandra McDonough did not and could not have taken into account the jury finding that $1 million was the market value of the two barges on November 14, 1986.

**23.** In point of error one, we showed that the promissory note had a payment factor of 1.7128%.

to the reasonable and necessary attorneys fees relating to Greycas's collection efforts on the promissory note. Norton graduated from law school in 1963 and had practiced law continuously since that time. He had concentrated his practice in civil trial law. He was familiar with the reasonable, usual, customary, and necessary attorneys fees for Nueces County, Texas regarding trial law and preparing witnesses and documents for trial. Before trial of this case, he familiarized himself with the amount of time that Greycas's attorney, Lee Casstevens, and Casstevens's law firm had spent on the case. Norton had read the pleadings, looked at the pleadings' and discovery indexes, and he had read Casstevens's affidavit concerning Casstevens's time and legal fees expended through September 19 or 21, 1991. Casstevens asked Norton if he had an opinion what the reasonable and necessary charge amounted to in Nueces County, Texas for legal services rendered up to that day in trial for collection of the promissory note and guarantees. He testified that based upon the work that Casstevens and his law firm performed, legal fees were in excess of $300,000. He testified that in his opinion $200,000 to $300,000 was a reasonable and necessary legal fee to handle an appeal of the action on the note and guarantees to the court of appeals. He estimated that $125,000 to $175,000 was a reasonable and necessary fee for application for writ of error and hearing, if granted, to the Texas Supreme Court.

On cross-examination, Norton admitted that he had not attended the whole trial. Appellants' counsel asked him the following:

Counsel: You can't say that everything Mr. Casstevens did, all the questions he asked and all the witnesses he called were necessary in order to try this case.

Norton: I don't have a basis for saying whether it was necessary or whether it was not necessary.

Even though Norton had no basis to say whether the questions Casstevens asked and the witnesses he called were necessary, this does not justify the jury's failure to award attorneys fees for preparation and trial of the case. Further, Norton's expert testimony was uncontradicted, unimpeached, and con-

sistent concerning the reasonable and necessary attorneys fees to appeal this case. After weighing and considering all the evidence, we find that the jury's failure to award attorneys fees for trial or appeal is against the great weight and preponderance of the evidence and is manifestly unjust. We sustain Greycas's third cross-point of error.

Greycas requests a remand of the case for the purpose of determining its attorneys fees. *See International Sec. Life Ins. Co. v. Finck*, 496 S.W.2d 544, 547 (Tex.1973); *Barclay v. Johnson*, 686 S.W.2d 334, 339–40 (Tex.App.—Houston [1st Dist.] 1985, no writ). We agree and remand this case to the trial court for the purpose of determining Greycas's attorneys fees.

Due to our disposition of appellants' points of error, we need not address Dial's or GFC's remaining cross-points of error. TEX. R.APP.P. 90(a).

We REMAND this case for a new trial to determine the issue expressed in Special Question 28 and Greycas's attorneys fees. We REFORM the judgment to show that post-judgment interest shall accrue at 18% from the judgment date until paid. We AFFIRM the remainder of the judgment.

PAUL W. NYE, Former Chief Justice, not participating.