No. 93-405

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

STATE OF MONTANA,

      Plaintiff and Respondent,

-v-

JAMES ALLEN EGELHOFF,

      Defendant and Appellant

FILED

JUL 06 1995

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Nineteenth Judicial District,
In and for the County of Lincoln,
The Honorable Robert S. Keller, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

        Ann C. German, Libby, Montana; Amy Guth, Lincoln
County Public Defender, Libby, Montana

    For Respondent:

        Hon. Joseph P. Mazurek, Attorney General, Pamela P.
Collins, Assistant Attorney General, Helena,
Montana; Scott B. Spencer, Lincoln County Attorney,
Libby, Montana

Heard:  October 27, 1994

Submitted:  February 23, 1995

Decided:  July 6, 1995

Filed:

_____
Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

James Allen Egelhoff (Egelhoff) appeals his conviction in the District Court of the Nineteenth Judicial District, Lincoln County, on two counts of deliberate homicide for the shooting deaths of his two companions following a day of drinking. Egelhoff was sentenced to forty years on each count and an additional two-year term for use of a weapon on each count, a total of eighty-four years, to run consecutively. The District Court also designated him as a dangerous offender for parole purposes. We reverse and remand.

The following issues are presented on appeal:

I. Was Egelhoff denied due process by a jury instruction that voluntary intoxication may not be taken into consideration in determining the existence of a mental state which is an element of the offense?

II. Did the District Court err in permitting a lay witness to give opinion testimony?

III. Are the jury verdicts finding Egelhoff guilty of two counts of deliberate homicide supported by substantial evidence?

IV. Did the District Court err in designating Egelhoff a dangerous offender for purposes of parole?

We conclude that Issue I is dispositive.

Egelhoff was convicted by a jury of two counts of deliberate homicide for the July 12, 1992 shooting deaths of Roberta Pavola (Pavola) and John Christianson (Christianson). At approximately midnight on July 12, 1992, their bodies were found in the front seat of the station wagon belonging to Christianson and Egelhoff was found in the rear cargo area, alive but intoxicated.

Egelhoff and a friend from Helena went to the Yaak area near Troy to pick mushrooms in early July 1992. Egelhoff had no

2

transportation and no personal effects apart from some clothing and a .38 caliber handgun which he kept in a holster on his right hip.

Pavola and Christianson, also in the Yaak area to pick mushrooms, camped in an area near the place where they picked mushrooms. Egelhoff and his companion camped in the same area as Christianson and Pavola and became acquainted with them. Egelhoff's companion departed prior to the day Pavola and Christianson were killed.

Egelhoff, Pavola and Christianson sold their mushrooms on Sunday, July 12, 1992 and then bought beer and went to a party at a Troy apartment. They spent most of the day drinking at the party and in bars. The trio left the party sometime after 9:00 p.m. in Christianson's station wagon with Christianson driving, Pavola in the front passenger seat and Egelhoff in the rear.

Much of what occurred after they left the party that evening is unknown. Testimony at trial indicated that Egelhoff and Christianson were seen in an IGA grocery store at approximately 9:20 p.m. and that Christianson's station wagon was seen being driven in an erratic manner on Highway 2 west of Troy a while later. Christianson's vehicle was also observed going off the road into a ditch several times. Law enforcement officers later located five places in the area where a vehicle had gone off the highway.

Numerous witnesses testified about their observations during this period of time. Two of the witnesses who observed the Christianson vehicle reported a possible drunken driver to the Lincoln County Sheriff's department shortly before midnight. When the station wagon came to its final stop and the sheriff's officers

3

arrived, it was situated in a ditch, Pavola and Christianson were dead and Egelhoff was yelling obscenities from the rear of the vehicle.

Both Pavola and Christianson died from gunshot wounds. Pavola had been shot in the left temple area and Christianson was shot in the right back side of his head. Pavola's body remained in the passenger seat near the window and Christianson's body was found in the middle of the front seat close to Pavola with his legs on the floorboards in front of the passenger's seat and Pavola's upper body slumped over his legs. Egelhoff's gun was found on the floorboard near the brake pedal on the driver's side and Egelhoff was in the back of the station wagon where the back seat had been laid flat. Egelhoff's revolver was found with four loaded rounds and two empty casings. Egelhoff was lying on his right side with his head towards the back of the cargo area.

Detective Clint Gassett responded to a call about 1:00 a.m. on July 13, 1992, and came to the Libby hospital where Egelhoff had been brought by officers. He testified that Egelhoff was intoxicated, combative and cursing profusely. Detective Gassett, another officer and others attempted to physically restrain Egelhoff by holding him down on the table by his arms and chest. Detective Gassett testified that Egelhoff continued to act wildly during the five to six hours Gassett was at the hospital. Egelhoff would calm down at times only to repeatedly flare up again.

According to the testimony of Detective Gassett, at one point when another detective was preparing to take Egelhoff's photograph, Egelhoff looked directly at the detective, pulled his leg back and

4

kicked the camera out of the detective's hands with the flat of his foot, knocking the camera to the floor. Detective Donald Bernall testified that he thought Egelhoff's coordination was good and he was surprised to learn that Egelhoff's blood alcohol content was .36 percent.

Egelhoff testified that he did not remember much of what happened on the evening of July 12, 1992, his last memory being that he was at the party at the Troy apartment and that the sun had not gone down. He testified he did not remember leaving the party, being in the station wagon, shooting the gun, or kicking Detective Bernall at the hospital. He further testified he remembered that at one point in the evening the station wagon was parked somewhere, and he and Christianson were sitting on a hill or a bank passing a bottle of Black Velvet back and forth between them. He had no recollection of Pavola being with them at that time.

Forensics testing identified gunshot residue on Egelhoff's hands. The bullet that killed Pavola entered her head at the left temple, exited the right back side of her head and was never found. Testimony by the State's firearms examiner indicated that the bullet which killed Christianson could have come from thousands of guns with characteristics like Egelhoff's gun.

At trial, Egelhoff contended that because he had been found unconscious and suffering from intoxication measured at .36 one hour after being brought to the hospital, his level of intoxication precluded him from having driven the car or undertaking the physical tasks necessary to have done what the prosecution claimed he had done. He contended that he suffered from an alcohol-induced

5

amnesia (blackout) which prevented him from recalling the events of the night in question.

When ambulance attendants came to take him to the hospital, Egelhoff kept asking questions like, "Did you find him?" When he sobered up the next day, Egelhoff did not recall asking the questions or to whom he may have been referring when he asked them. Part of Egelhoff's theory which he presented at trial was that there was a fourth person in the car who had disappeared before officers arrived at the scene of the accident.

Dr. Clyde Knecht, a medical doctor who practiced in Libby, examined Egelhoff in the emergency room at the Libby hospital in the early morning hours of July 13, 1992. He testified that Egelhoff, judging from his blood alcohol level and his behavior, probably suffered from alcoholic "blackout" at some point in time and for some period of time prior to the time of Dr. Knecht's examination. He also testified that an intoxicated person experiencing such a blackout may walk, talk, and fully function, with people around the person unable to tell that the person experienced a blackout.

A jury found Egelhoff guilty of two counts of deliberate homicide for the deaths of Christianson and Pavola. Because defendant is granted a new trial as a result of our reversal of his conviction as discussed below, we decline to address the remaining issues raised by Egelhoff.

I

Was Egelhoff deprived of due process when the District Court instructed the jury that voluntary intoxication may not be taken

6

into consideration in determining the existence of a mental state which is an element of the offense of deliberate homicide?

Although Egelhoff raised four issues on appeal, oral argument was granted only on this issue concerning the constitutional validity of the 1987 amendment to § 45-2-203, MCA, regarding consideration by the jury of evidence of intoxication in criminal trials. Egelhoff voluntarily consumed alcoholic beverages on the day of the homicides to the extent that his blood alcohol level measured at least .33% and possibly .36%.

The District Court gave the following instruction to the jury containing statutory language from § 45-2-203, MCA, referring to voluntary intoxication:

INSTRUCTION NO. 11
A person who is in an intoxicated condition is criminally responsible for his conduct and an intoxicated condition is not a defense to any offense and may not be taken into consideration in determining the existence of a mental state which is an element of the offense unless the Defendant proves that he did not know that it was an intoxicating substance when he consumed the substance causing the condition.

We first address the State's argument that Egelhoff did not object to Instruction No. 11 on the ground now asserted. Egelhoff objected to Instruction No. 11 for several reasons, including constitutional reasons. Egelhoff's counsel objected to the instruction at the time of settling jury instructions. At that time, she claimed that § 45-2-203, MCA, is unconstitutional because it has the effect of negating the requirement that the State prove a mental state when proving deliberate homicide where the defendant is voluntarily intoxicated. She also argued that § 45-2-203, MCA, is unconstitutional because it shifts the burden of proof on the

7

element of mental state from the prosecution to the defendant. In addition to making these objections during the trial, Egelhoff's counsel also made the same arguments and explained them in greater detail in her post-trial motion for a new trial. We conclude from our review of the record that Egelhoff's counsel properly objected to the giving of this instruction.

Egelhoff was convicted of two counts of deliberate homicide. To convict on a charge of deliberate homicide, the State must prove as an element of the offense that the defendant acted "knowingly" or "purposely" in causing the death of another human being. Section 45-5-102, MCA. Egelhoff claimed § 45-2-203, MCA, is unconstitutional because it deprives defendants of due process by removing from the jury's consideration facts relevant to a determination of mental state, an essential element of the offense to be proven beyond a reasonable doubt by the State.

Section 45-2-203, MCA, as amended in 1987, provides:

> **45-2-203. Responsibility -- intoxicated condition.** A person who is in an intoxicated condition is criminally responsible for his conduct and an intoxicated condition is not a defense to any offense and may not be taken into consideration in determining the existence of a mental state which is an element of the offense unless the defendant proves that he did not know that it was an intoxicating substance when he consumed, smoked, sniffed, injected, or otherwise ingested the substance causing the condition. (Emphasis supplied.)

In 1985, § 45-2-203, MCA, provided:

> **45-2-203. Responsibility -- intoxicated or drugged condition.** A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. An intoxicated or drugged condition may be taken into consideration in determination of the existence of

8

<u>a mental state which is an element of the offense</u>. (Emphasis supplied.)

Egelhoff does not contend that he has the right to the affirmative defense of voluntary intoxication. He challenges only the exclusion of evidence from the jury's deliberations for purposes of determining mental state (the 1987 amendment). Egelhoff contends that Instruction No. 11, containing the statutory language from § 45-2-203, MCA, removed evidence of alcohol intoxication from the jury's consideration in determining whether he acted "knowingly" or "purposely" and relieved the prosecution of its burden to prove the required mental state for deliberate homicide, which is constitutionally impermissible.

The State contends that Egelhoff was not prejudiced because he was allowed to use the evidence of intoxication in order to explain his inability to remember the events of the evening as being the result of an alcohol-induced "blackout" and also as evidence of his lack of physical coordination which would have made it impossible for him to have driven Christianson's station wagon the night of the homicides. The State also argues that Egelhoff was not deprived of due process because the court also instructed the jury that the State had the burden of proving all elements of the offense beyond a reasonable doubt.

It is well established that in order to afford a defendant due process under the Fourteenth Amendment of the United States Constitution, the State must prove every element of the offense beyond a reasonable doubt. <u>See</u> In Re Winship (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375. In addition,

9

Sandstrom v. Montana (1979), 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39, 51, held that an instruction which shifted the burden of proof on the element of mental state to the defendant is unconstitutional. In Sandstrom, the burden shifting resulted from instructing the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." The Sandstrom presumption was a rebuttable presumption.

Egelhoff argues that in Sandstrom the defendant was at least allowed the opportunity to rebut the presumption. He contends he is denied that opportunity because the instruction prohibits consideration of his intoxication in determining whether he acted knowingly and purposely. Egelhoff also contends that Morissette v. United States (1951), 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, supports his arguments because the United States Supreme Court there condemned a process by which a defendant could be convicted of criminal intent without proof by the government, which was determined to be inconsistent with our philosophy of criminal law.

Our concern here is with proof of the mental state element of the offense of deliberate homicide. The evidence presented at trial established that Egelhoff had a level of intoxication measured at .36. It is clear that such evidence was relevant to the issue of whether Egelhoff acted knowingly and purposely; yet Instruction No. 11 precluded the jury from considering it for that purpose.

The prosecution presented a great deal of evidence which reflected on Egelhoff's ability to shoot Pavola and Christianson despite his level of intoxication. That evidence included the

10

following: In order to commit the crimes, he had to take the gun from the glove compartment of the vehicle. He made an attempt to flee after he went into the ditch. He tried to avoid detection when Rebecca Garrison tried to approach the car. Ms. Garrison noticed a stick which she assumed must have been used by Egelhoff to depress the accelerator so that Egelhoff could drive from the back seat. He could talk. At the IGA store at 9:20 p.m., Egelhoff spoke well and did not slur his words. He later told Ms. Garrison to "stay away" and he talked to the ambulance driver. He had physical energy and strength. He tried to avoid detection by another of the witnesses who had stopped to give assistance. Detective Bernall testified that his coordination was good as was demonstrated by his kicking of the camera. The evidence was presented by the State to establish that Egelhoff acted "purposely" or "knowingly." Such evidence could be properly considered by the jury in its determination of whether or not he acted "purposely" or "knowingly."

However, Egelhoff was not allowed to rebut such evidence with evidence that his level of intoxication precluded him from forming the requisite mental state. As a result of the elimination of the opportunity of using this rebuttal evidence, the prosecution's burden of proof for the element of mental state was reduced.

This is a denial of due process. Due process is "the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi (1973), 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297, 308. This right to present a defense is fundamental. Chambers, 410 U.S. at 302, 93 S.Ct. at 1049, 35

11

L.Ed.2d at 312. In Martin v. Ohio (1987), 480 U.S. 228, 233, 107 S.Ct. 1098, 1101, 94 L.Ed.2d 267, 274, the United States Supreme Court upheld a conviction of murder where the defendant attempted to prove self defense. The Supreme Court held it was not a violation of due process to place the burden of proving self defense on a defendant charged with committing aggravated murder. The Court in Martin emphasized that the defendant had the opportunity under the law and instructions to justify the killing by showing herself blameless because she acted in self defense. As a part of that discussion the Martin Court then stated:

> It would be quite different if the jury had been instructed that self-defense evidence could not be considered in determining whether there was a reasonable doubt about the State's case, *i.e.*, that self-defense evidence must be put aside for all purposes unless it satisfied the preponderance standard. Such instruction would relieve the State of its burden and plainly run afoul of Winship's mandate. 397 U.S., at 364. The instructions in this case could be clearer in this respect, but when read as a whole, we think they are adequate to convey to the jury that all of the evidence, including the evidence going to self-defense, must be considered in deciding whether there was a reasonable doubt about the sufficiency of the State's proof of the elements of the crime.
>
> . . .
>
> When the prosecution has made out a prima facie case and survives a motion to acquit, the jury may nevertheless not convict if the evidence offered by the defendant raises any reasonable doubt about the existence of any fact necessary for the finding of guilt. Evidence creating a reasonable doubt could easily fall far short of proving self-defense by a preponderance of the evidence. . . .

Martin, 480 U.S. at 233-34, 107 S.Ct. at 274-75, 94 L.Ed.2d at 1102. While the above statement may not have been essential to the holding of the Court, it emphasizes a clear distinction between

12

placing a burden upon a defendant to prove a specific aspect of her defense, in this case self defense, and instructing a jury that self defense evidence <u>could not be considered</u> in determining whether there was a reasonable doubt as to her guilt. The analysis is clearly applicable to our present case. While Egelhoff was given the opportunity to present evidence of his level of intoxication, the instruction prevented consideration by the jury as it decided whether or not there was a reasonable doubt as to Egelhoff's acting "knowingly" and "purposely." Because the jury was not allowed to consider that evidence for such a purpose, the State was relieved of part of its burden to prove beyond a reasonable doubt every fact necessary to constitute the crime charged. It was reversible error to instruct the jury not to consider it.

By allowing the jury to consider such evidence, we permit the jury to make its decision on all of the relevant evidence as required under <u>Martin</u>. By instructing the jury that it may not consider intoxication evidence for purposes of determining a mental state of "knowingly" or "purposely," the jury may be misled into believing the State has proved the mental state beyond a reasonable doubt and that is why defendant cannot introduce evidence in opposition to a specific state of mind. The State should never escape its burden of proof of each element of the offense.

Egelhoff's argument focuses on "burden shifting" which is not technically what happens in a case such as the present one. The burden is not shifted but rather it is lessened because the defendant is precluded from presenting arguments concerning the

13

prosecution's "failure of proof" of the subjective mental state element required for conviction of a crime which includes the mental state of acting "knowingly" or "purposely."

Similar arguments were presented in State v. Byers (1993), 261 Mont. 17, 41-41, 861 P.2d 860, 875. There are significant factual differences between Byers and the present case, because Byers did not rely upon intoxication as an element of his defense and because there was no question in Byers that he had committed the two homicides, whereas in the present case Egelhoff relies on the intoxication defense as part of his argument and the basic issue was whether or not he actually committed the homicides.

In Byers the holding was that the district court did not commit reversible error by instructing the jury that voluntary intoxication is not a defense to criminal activity. Our holding in the present case does not conflict with the express holding in Byers. In Byers we did state that the intoxication instruction which was identical to that in the present case did not relieve the State of its burden of proving beyond a reasonable doubt all of the elements of the offense. In making that statement, although it was dicta, we were not correct as appears from our foregoing analysis. We overrule any of the statements made in Byers to the extent that it indicates it is constitutional to instruct that an intoxicated condition may not be taken into consideration in determining the existence of a mental state which is an element of the offense.

We conclude that the defendant had a due process right to present and have considered by the jury all relevant evidence to rebut the State's evidence on all elements of the offense charged.

14

We conclude that the following portion of § 45-2-203, MCA (1993), is a violation of due process and is therefore unconstitutional:

> [an intoxicated condition]. . . may not be taken into consideration in determining the existence of a mental state which is an element of the offense. .

We hold Egelhoff was denied due process when the jury was instructed that voluntary intoxication may not be taken into consideration in determining the existence of a mental state which is an element of the offense.

For the benefit of the bench and bar of Montana, we briefly discuss the extent to which the holding of this decision has application to other cases. In a criminal case we have noted that, at a minimum, all "new" rules of constitutional law must be applied to cases still subject to direct review at the time the "new" decision is handed down. State, City of Bozeman v. Peterson (1987), 227 Mont. 418, 420, 739 P.2d 958, 960, citing Shea v. Louisiana (1985), 470 U.S. 51, 57, 105 S.Ct. 1065, 1069, 84 L.Ed.2d 38, 45.

The United States Supreme Court has refined its position since we decided Peterson, stating as follows:

> We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final[.]

Griffith v. Kentucky (1987), 479 U.S. 314, 328, 107 S.Ct. 709, 716. 93 L.Ed.2d 649, 661. We conclude that the foregoing rule is binding upon this Court.

15

With regard to the question of retroactivity, the United States Supreme Court has additionally made its position more clear and we find this also to be binding upon us:

> Retroactivity is properly treated as a threshold question, for, once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated. . . .
>
> It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes. In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. [Citations omitted.]

Teague v. Lane (1989), 489 U.S. 288, 300-01, 109 S.Ct. 1060, 1070, 103 L.Ed.2d 334, 349.

We conclude that we have here established a "new rule." Based upon the foregoing authorities, we conclude that our decision is applicable to all cases still subject to direct review by this Court on the date of this opinion. With regard to collateral review as compared to a direct review of cases, the United States Supreme Court has clarified its position as to collateral review of criminal convictions, stating:

> [W]e now adopt Justice Harlan's view of retroactivity for cases on collateral review. Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.
>
> . . .
>
> The first exception suggested by Justice Harlan-- that a new rule should be applied retroactively if it places "certain kinds of primary, private individual

16

conduct beyond the power of the criminal law-making authority to proscribe," . . .

The second exception suggested by Justice Harlan--that a new rule should be applied retroactively if it requires the observance of "those procedures that . . . are 'implicit in the concept of ordered liberty,'" [citation omitted]--we apply with a modification. The language used by Justice Harlan in Mackey leaves no doubt that he meant the second exception to be reserved for watershed rules of criminal procedure[.]

Teague, 489 U.S. at 310-11. We conclude that such view of retroactivity for cases on collateral review is binding upon this Court.

We conclude that this decision does not fall within either of the two above described exceptions to the general rule of non-retroactive application to collateral review. We therefore state this opinion will apply retroactively to those cases still subject to final decision on direct review on the date of this opinion, but will not apply retroactively to cases on collateral review after the date of this opinion.

Reversed and remanded for a new trial.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices

17

District Judge James E. Purcell

18

Justice James C. Nelson specially concurs.

I concur in our opinion. I write separately only because of my lingering concern that our decision will be misread as allowing an affirmative defense of voluntary intoxication in criminal cases. That is absolutely not so. This case is not about a defense. Rather, it deals with burden of proof and the fundamental obligation of the State to prove each element of a criminal charge --including the mental state element--beyond a reasonable doubt.

As a general proposition, the legislature may enact statutes that specify what defenses are and are not available to a charge of criminal conduct. In Montana, the legislature has, permissibly, determined that voluntary intoxication is not a defense to the commission of a crime and that, while voluntarily intoxicated, a person is still criminally responsible for his or her conduct. In other words, a defendant may not come before the jury and say: "I shot and killed Smith because (or while) I was drunk. You must, therefore, acquit me." To that extent, the portion of § 45-2-203, MCA, which provides that "an intoxicated condition is not a defense to any offense" was and is constitutional. That portion of the statute is not at issue in this case.

On the other hand, as pointed out in our opinion, it is always the obligation of the State to prove beyond a reasonable doubt each and every element of the crime charged, including that the defendant acted with the requisite mental state. If, in a given case, the only way that the prosecution can prove the defendant's mental state is by prohibiting the jury from considering the fact

19

that the defendant was too intoxicated to form the requisite mental state, then the State effectively and impermissibly has been relieved of all or part of its burden to prove beyond a reasonable doubt an essential element of the crime charged. Under both the Montana and federal constitutions, the defendant must be allowed to come to the jury and, in effect, say: "I did not act purposely or knowingly; and the reason that I did not, is because I was too drunk to act with either of those two mental states. If you, jury, conclude that to be true--and that is solely your call based on all the evidence--then you must also conclude that the prosecution has not proven an essential element of the crime charged beyond a reasonable doubt, and you must, therefore, acquit me."

In short, the language ". . . _and may not be taken into consideration in determining the existence of a mental state which is an element of the offense_. . ." (emphasis added) inserted in the 1987 and subsequent versions of § 45-2-203, MCA, effectively and impermissibly relieves or lessens the burden of the State to prove beyond a reasonable doubt an essential element of the offense charged--the mental state element--by statutorily precluding the jury from considering the very evidence that might convince them that the State had not proven that element.

It remains the burden of the State to prove beyond a reasonable doubt mental state _despite_ the defendant being intoxicated. The statutory language at issue here eliminates or lessens that burden and is, therefore, constitutionally infirm.

Under § 45-2-203, MCA, and our decision here, a voluntarily

20

intoxicated defendant remains criminally responsible for his conduct and his voluntarily intoxicated condition continues not to be a defense to any offense. However, the defendant's intoxicated condition may be taken into consideration by the finder of fact in determining the existence of a mental state which is an element of the offense charged.

_____
Justice

Justice Karla M. Gray joins in the foregoing special concurrence.

_____
Justice

21

Chief Justice J. A. Turnage, specially concurring:

I respectfully specially concur, specifically to the majority opinion holding that the opinion will apply retroactively to those cases still subject to final decision on direct review on the date of this opinion but will not apply retroactively to cases on collateral review after the date of this opinion.

I further specially concur and urge the next session of the Montana legislative assembly to amend § 45-2-203, MCA, to eliminate the problem this Court finds to exist in the 1987 amended version of this statute. I would recommend that the legislature consider amending § 45-2-203, MCA, to reinstate the provisions thereof that existed in the 1985 version of this statute. Such amendment would essentially reinstate language that "[a]n intoxicated or drugged condition may be taken into consideration in determination of the existence of a mental state which is an element of the offense."

Chief Justice

22

Justice Terry N. Trieweiler specially concurring in part and dissenting in part.

I concur with the majority's conclusion that the stricken portions of § 45-2-203, MCA (1993), violated Egelhoff's right to due process, and therefore, were unconstitutional. However, I do not agree with all that is said in the majority opinion.

I specifically disagree that a principle of constitutional law can be made applicable to some citizens and not others.

In my view, the role of this Court is to interpret the Constitution and apply it to the parties before it. Whether the parties come before this Court by direct appeal, or by statutorily authorized collateral review, is irrelevant. The protections afforded by the Constitution apply to everyone. It makes no sense to have different interpretations based on the procedure by which an unconstitutionally treated person arrives in our Court.

The majority relies on *Teague v. Lane* (1989), 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d. 334, for the principle that "new" rules of constitutional law must be applied to all cases still subject to review, but only under limited circumstances to cases which are collaterally reviewed. *Teague,* and the U.S. Supreme Court's earlier decision in *Griffith v. Kentucky* (1987), 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649, are based largely on the earlier dissent of Mr. Justice Harlan in *Mackey v. United States* (1971), 401 U.S. 667, 91 S. Ct. 1160, 28 L. Ed. 2d. 404. In *Mackey,* the majority of the U.S. Supreme Court refused to apply two of its decisions interpreting

23

the Fifth Amendment right against compulsory self-incrimination to other cases which were pending on direct appeal at the time those cases were decided. In dissent, Justice Harlan pointed out that selectively applying the Constitution to people who are similarly situated based merely on the circumstances or timing of their appearance in court is the antithesis of the judiciary's responsibility. Since his observations are equally applicable to the distinction made between those defendants who appear by direct appeal and those who appear by collateral review, they are worth repeating.

> We announce new constitutional rules, then, only as a correlative of our dual duty to decide those cases over which we have jurisdiction and to apply the Federal Constitution as one source of the matrix of governing legal rules. We cannot release criminals from jail merely because we think one case is a particularly appropriate one in which to apply what reads like a general rule of law or in order to avoid making new legal norms through promulgation of dicta. This serious interference with the corrective process is justified only be necessity, as part of our task of applying the Constitution to cases before us. Simply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule constitute an indefensible departure from this model of judicial review.

> . . . In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review, is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation. We apply and definitively interpret the Constitution, under this view of our role, not because we are bound to, but only because we occasionally deem it appropriate, useful, or wise. That sort of choice may permissibly be made by a legislature or a council of revision, but not by a court of law.

24

> . . . .
>
> . . . I continue to believe that a proper perception of our duties as a court of law, charged with applying the Constitution to resolve every legal dispute within our jurisdiction on direct review, mandates that we apply the law as it is at the time, not as it once was. Inquiry into the nature, purposes, and scope of a particular constitutional rule is essential to the task of deciding whether that rule should be made the law of the land. That inquiry is, however, quite simply irrelevant in deciding, once a rule has been adopted as part of our legal fabric, which cases then pending in this Court should be governed by it.

*Mackey*, 401 U.S. at 678-81, 28 L. Ed. 2d at 412-14 (Harlan, J., dissenting).

While Justice Harlan was unwilling to apply the same logic to those cases reviewed by a petition for a federal writ of habeas corpus, I can see no reason for making such a distinction under state law. The bases by which criminal convictions can be collaterally reviewed in Montana are very limited. *See* § 46-22-101, MCA (habeas corpus), and § 46-21-105(2), MCA (limitations on post-conviction relief). Furthermore, no criminal conviction can be reversed under Montana law, even if constitutional rights were violated, where the constitutional infraction did not contribute to the defendant's conviction. Section 46-20-104, MCA.

The effect of the majority's limitation on the application of their decision, then, is to hold that even in those cases where people have been convicted and jailed in violation of their right to due process, and even where that violation is raised properly by collateral review, we will not consider the constitutional

25

infraction simply because it is brought to our attention by collateral review, rather than direct appeal.

This dichotomy is irrational and offends the very traditions of fairness and due process which we, as a judicial body, are charged to enforce.

For these reasons, while I concur with the result arrived at in this case, I dissent from that part of the majority opinion which would selectively apply the constitution of this State, or of the United States, based upon the procedure by which offensive governmental conduct is brought to our attention.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing concurring and dissenting opinion.

_____
Justice

26