**Richard MATA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–96–012–CR.**

Court of Appeals of Texas, Waco.

Feb. 5, 1997.

Mata of the lesser-included offense of voluntary manslaughter and assessed punishment at twenty years' incarceration in the Institutional Division of the Texas Department of Criminal Justice and a fine of $10,000. TEX. PENAL CODE ANN. §§ 12.33, 19.04 (Vernon 1994). In six points of error, Mata alleges that: (1) the trial court erred by failing to charge the jury on the right of self defense against multiple assailants; (2) section 8.04 of the Texas Penal Code is unconstitutional; (3) the trial court erred in not complying with the requirements for juror note-taking; (4) the State committed error by improperly commenting on Mata's opportunity to formulate his testimony after listening to the other witnesses; (5) the trial court erred in entering a deadly weapon finding without providing Mata with proper notice; and (6) the evidence was factually insufficient to support the jury's rejection of Mata's theory of self defense.

Mata was indicted for the murder of Rutilio Rivera. Rivera's death occurred after an altercation between Mata and Rivera and two of Rivera's friends, Raymond Salazar and Julio Lazoya. On June 13, 1993, Rivera, Salazar, and Lazoya went to the home of Daisey and Eva Diaz for the purpose of retrieving an audio tape that Rivera had loaned to Daisey and Eva's brother, Leno Diaz. Mata was visiting his girlfriend, Eva, at this time. At some point during Rivera and Leno's conversation, Mata went outside, taking a steak knife as protection. The record is unclear as to exactly what transpired thereafter.

According to the State's witnesses, Mata and Rivera began arguing and Mata stabbed Rivera. Rivera, Salazar, and Lazoya then grabbed Mata in an attempt to detain and disarm him. According to the defense, Rivera, Salazar, and Lazoya attacked Mata, wrestling him to the ground, where they proceeded to kick and beat him. Mata, in an attempt to free himself, stabbed at his attackers, wounding Rivera in the melee. In either event, Rivera's death resulted.

Walter M. Reaves, Jr., West, for appellant.

John W. Segrest, Criminal District Attorney, Crawford Long, Mike Freeman, Asst. District Attorneys, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

Appellant, Richard Mata, was indicted for the offense of murder. A jury convicted

In his first point of error, Mata contends the trial court committed fundamental error when it failed to charge the jury on the right

to defend against multiple assailants. At trial, the court instructed the jury on self defense; however, the court submitted only the right of Mata to defend himself against Rivera, the deceased. Neither Salazar nor Lazoya was mentioned in the court's instructions on Mata's right of self defense. The State concedes that Mata would have been entitled to an instruction on his right to defend himself against multiple assailants had he so requested. However, Mata neither objected to the charge as given to the jury nor requested an instruction on his right to defend against multiple assailants.

■ The first inquiry in a review of the charge to the jury is whether the alleged error actually occurred and if complaint of the error was preserved. If the complaint was preserved at trial, then any harm, regardless of the degree, is sufficient to require a reversal of a conviction. *Hutch v. State*, 922 S.W.2d 166, 170–71 (Tex.Crim.App.1996); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim.App.1984) (on rehearing). However, if the alleged error is raised for the first time on appeal, then the appellant must show that the harm resulting from the error was egregious, or so harmful that the appellant was denied a fair and impartial trial. *Hutch*, 922 S.W.2d at 171; *Almanza*, 686 S.W.2d at 171.

■ A person is justified in using deadly force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force if a reasonable person in the actor's situation would not have retreated. TEX. PENAL CODE ANN. §§ 9.31, 9.32 (Vernon 1994 & Supp.1997); *see also Hamel v. State*, 916 S.W.2d 491, 493 (Tex.Crim.App.1996). Furthermore, the Court of Criminal Appeals has held that a defendant is entitled to a charge on the right to defend against multiple assailants if there is evidence, no matter how weak or contradicted, the defendant believed himself to be in danger of attack from more than one person. *Frank v. State*, 688

S.W.2d 863, 868 (Tex.Crim.App.1985). Restricting the charge to the right of self defense against only the deceased is error if there is evidence that more than one person assailed the defendant. *See id.; Sanders v. State*, 632 S.W.2d 346, 347–48 (Tex.Crim.App. [Panel Op.] 1982).

Rivera and Salazar had a history of discord with Mata. Mata testified that he had been "jumped" by Rivera and several of Rivera's friends on at least one prior occasion. He also related an incident, which occurred at a gas station, where Rivera slammed a car door on his leg. Mata further testified that when he attempted to return a car to his ex-wife at Salazar's house, Rivera, Salazar, and another man threw bottles and rocks at him.[1] Mata also stated that on several other occasions during the six months preceding the stabbing Rivera and Salazar chased him. Mata testified that the tattoos on Salazar's face represented to him that Salazar was a gang leader and that he had killed someone.

■ In regard to the night of the stabbing, Mata testified he became scared when he realized that Rivera and Salazar were outside the house. He stated that when he saw Salazar exit the vehicle he became afraid that Salazar and Rivera "were going to jump [him] like they had done before." He also testified that he could not exit the house except through the front door because the back door was nailed shut and that he was "terrified."

Although the trial court did charge the jury on Mata's right of self defense against Rivera, we find there was some evidence that he believed all three men were about to attack him. Because there was adequate evidence to support an instruction to the jury regarding Mata's right to defend himself against multiple assailants, it was error for the trial court to limit its instructions to Mata's right to defend himself against only the deceased.[2]

---

1. The record indicates that Mata's ex-wife, Lisa Torres, is related to Raymond Salazar.

2. Because self defense is a defense under the Penal Code, "[t]he issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense." TEX. PENAL CODE ANN. § 2.03(c) (Vernon 1994); *see also Saxton v. State*, 804 S.W.2d 910, 912 n. 5 (Tex. Crim.App.1991).

Having found the trial court committed error, we must now turn to the question of whether such error resulted in egregious harm. Egregious harm is that which alters the very basis of the defendant's case, deprives the defendant of a valuable right or significantly affects a defensive theory. *Hutch,* 922 S.W.2d at 171; *Almanza,* 686 S.W.2d at 171. To determine if egregious harm resulted from a jury charge error, we must consider: (1) the charge itself; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Hutch,* 922 S.W.2d at 171; *Bailey v. State,* 867 S.W.2d 42, 43 (Tex.Crim.App.1993). The appellant has the burden of showing that actual, not theoretical, harm occurred and that it was so utterly erroneous as to deny the appellant a fair and impartial trial. *See Alvarado v. State,* 912 S.W.2d 199, 216–17 (Tex.Crim.App. 1995) (citing *Abdnor v. State,* 871 S.W.2d 726, 732 (Tex.Crim.App.1994)); *Williams v. State,* 851 S.W.2d 282, 287 (Tex.Crim.App.1993).

The jury was instructed on both the offense of murder and on the lesser-included offense of voluntary manslaughter. The jury chose to convict Mata of voluntary manslaughter. In regard to the instruction on voluntary manslaughter, the charge read:

> If you find from the evidence beyond a reasonable doubt that on or about the 13th day of June, 1993, in McLennan County, Texas, the defendant, Richard Mata, did intentionally or knowingly cause the death of an individual, Rutilio Rivera by stabbing him, or did then and there intentionally, with the intent to cause serious bodily injury to Rutilio Rivera, commit an act clearly dangerous to human life, namely, stab the said Rutilio Rivera which caused the death of Rutilio Rivera as alleged in the indictment, but you further find from all the facts and circumstances in evidence in the case, that the defendant, in killing the deceased, if he did, acted under the immediate influence of a sudden passion arising from an adequate cause, then you will find the defendant guilty of the lesser offense, voluntary manslaughter.

The charge defined "sudden passion" as "passion directly caused by and arising out of provocation by the individual killed *or another acting with the person killed,* which passion arises at the time of the offense and is not solely the result of former provocation." (Emphasis added).

The jury was also charged on the law of self defense. In the general instruction portion of the charge, the jury was instructed as follows:

> You are further instructed that in determining the existence of real or apparent danger, it is your duty to consider *all of the facts and circumstances in evidence in the case before you* and consider the words, acts, and conduct, if any, of Rutilio Rivera at the time of and prior to the time of the alleged killing, if any, and in considering such circumstances, you should place yourselves in defendant's position at that time and view them from his standpoint alone.

(Emphasis added).

During the course of trial, there was evidence presented that Salazar and Lazoya were, at the very least, in close proximity to Mata at the time of the stabbing. Additionally, during closing argument, the State discussed not only the presence of Salazar and Lazoya, but also the fact that both men got out of the vehicle once Mata came out into the yard. Furthermore, Mata's trial counsel expended much of his allocated time for closing argument on the issue of self defense as it related to Mata's perception of the situation based on his quarrelsome history with both Rivera's and Salazar's families and the previous attacks on him by Rivera and Salazar.

As a reviewing court, we must follow the appellate presumptions that the jury understood and followed the given instructions. *See Hutch,* 922 S.W.2d at 172; *Richardson v. State,* 879 S.W.2d 874, 882 (Tex.Crim.App. 1993). We can find nothing in the record to indicate that the jury only considered the acts of Rivera without also considering the presence and actions of Salazar and Lazoya. Consequently, because Mata has failed to demonstrate egregious harm from the omission of a jury instruction on his right of self

defense against multiple assailants, we over-rule Mata's first point of error.

■ In his sixth point, Mata contends the evidence is factually insufficient to support the jury's rejection of his self defense theory. Mata maintains that the proper standard for reviewing a jury's rejection of a defensive theory is the standard articulated in *Clewis v. State,* 922 S.W.2d 126, 135 (Tex. Crim.App.1996). We agree. As we held in *Hernandez v. State,* the proper standard for reviewing a jury finding rejecting a defensive theory is whether the evidence presented by both the State and the defense demonstrates that the conviction is clearly wrong and unjust.[3] 938 S.W.2d 503, 510 (Tex.App.—Waco 1997, pet. filed); *see also Jones v. State,* No. 72,026, slip op. at 4, —— S.W.2d ——, ——, 1996 WL 732038 (Tex.Crim.App. December 18, 1996); *Clewis,* 922 S.W.2d at 133, 135; *Brumbalow v. State,* 933 S.W.2d 298, 300 n. 1 (Tex.App.—Waco 1996, pet. ref'd). Consequently, because it is the State's burden to prove the use of deadly force by the defendant was not justified, we will review the evidence to determine whether it was sufficient to prove beyond a reasonable doubt that Mata was not justified in using deadly force against Rivera. *See* TEX. PENAL CODE ANN. §§ 2.03(d), 9.31, 9.32 (Vernon 1994 & Supp.1997); *Saxton v. State,* 804 S.W.2d 910, 914 (Tex.Crim.App.1991).

The following evidence was adduced at trial:

*Raymond Salazar*

Salazar testified to the following facts: On the night of the stabbing, he, Rivera, and Lazoya had been driving around Waco, drinking beer and listening to music when they drove to the Diaz house in order to get an audio tape from Leno Diaz. While Rivera and Leno were talking, Salazar saw Mata step out of the house and then immediately go back inside. After Mata went back inside the house, Rivera got out of the vehicle and continued his conversation with Leno until Mata came outside a second time. At that point, Mata and Rivera began arguing, and Salazar and Lazoya exited the vehicle. During the argument, Mata hit Rivera in the chest[4] and then quickly spun around and slashed Salazar on the finger, leaving a scar which was still visible two years after the wound. According to Salazar, neither he nor Rivera was armed and he did not hear Rivera make any threats to Mata.

On cross-examination, Salazar testified that, when he and Lazoya exited the vehicle, Mata, Rivera, Lazoya, and himself were all in "a little circle."

*Daisey Diaz*

On direct examination, Daisey Diaz testified that, on the night of the stabbing, Mata went outside for a brief period and then re-entered the house where he proceeded to arm himself with a steak knife and then go back outside. She testified that no one called Mata outside. She stated that ten minutes after Mata exited the house her brother, Leno, came into the house and told her and Eva that Rivera had been stabbed. When Daisey went outside all she saw was Rivera, Salazar, and Lazoya on top of Mata, who was on the ground. Daisey further testified that when Mata returned to the Diaz house much later that night he had a cut on his thumb that, according to him, he had gotten when he stabbed Rivera.

On cross-examination, Daisey testified that when Mata first arrived at the Diaz home she did not see any cuts, bruises, scrapes, or places where hair had been pulled out. She also testified that, after Mata realized who arrived in the vehicle, his manner became agitated.

*Julio Lazoya*

Lazoya testified that on the night Rivera was stabbed that, he, Rivera, and Salazar had been driving around Waco for several hours, drinking beer and listening to music when they went to the Diaz residence to get

---

3. Factual-sufficiency reviews in criminal cases should be conducted bearing in mind the appropriate burden and level of proof required at the trial court. *Hernandez v. State,* 938 S.W.2d 503, 509–10 (Tex.App.—Waco 1997, pet. filed); *Desselles v. State,* 934 S.W.2d 874, 879 (Tex.App.—Waco 1996, no pet.).

4. The testimonies of both Raymond Salazar and Julio Lazoya indicate that neither of them realized until Rivera collapsed that Mata had actually stabbed Rivera instead of merely "hitting" him in the chest.

an audio tape that previously had been loaned to Leno Diaz. Lazoya stated that he was not paying very close attention to the events unfolding in the Diaz front yard until he heard Rivera and Mata begin to argue. When the argument started, he and Salazar got out of the vehicle because they believed a fight was imminent. According to Lazoya, Mata was the one who escalated the confrontation from a verbal disagreement to a physical fray when he punched Rivera in the chest and then turned around to strike at Salazar. Lazoya did not see any other weapons besides the knife used to stab Rivera or hear any threats made to Mata.

*Dr. Nizam Peerwani*

Dr. Nizam Peerwani, the medical examiner who performed the autopsy on Rivera, testified that the wound resulting in Rivera's death was consistent with someone holding a knife with an overhanded grip. Dr. Peerwani also stated that a person who is stabbed in the manner Rivera was stabbed would not die instantaneously; that he would be capable of continuing to function for a short period of time. After viewing pictures of Mata's injuries which were admitted into evidence, Dr. Peerwani further testified that the injuries sustained by Mata were merely superficial and were not consistent with any injuries caused by violent kicking and hitting.

*Eva Diaz*

Eva Diaz was called as a witness for the defense. On direct examination she testified that Mata was her boyfriend and that, prior to dating Mata, she had dated Rivera. Regarding the night Rivera was stabbed, Eva testified that Mata had not wanted to go outside but that her brother, Leno, had called him outside. Eva further stated that Mata did not have any type of weapon when he went outside. She testified that when she looked outside, she saw three men surrounding Mata but that she did not see the fight begin because she went to check on her baby. She stated that when she again looked outside, she saw three men beating up Mata.

On cross-examination, Eva stated that when she first looked outside, she saw all the men on the ground and that Mata was being beaten by the other three. She further testified that her sister, Daisey, had lied about

Mata's taking a knife outside to confront Salazar and Rivera because Daisey did not like Mata.

*Richard Mata*

Testifying on his own behalf, Mata first related the previous incidents that had occurred between him, Rivera and Salazar. In regard to the night he stabbed Rivera, Mata testified that he went outside twice. The first time he merely stepped outside but stepped back inside when he saw Salazar exiting the vehicle. He stated that, because the front door was the only exit to the house, he decided to go back outside but took a small knife to protect himself in case Salazar decided to "jump" him as he had in the past. Mata stated that when he went outside, he saw Salazar walk around the back of the vehicle, Lazoya walk around the front, and Rivera exit the driver's side and begin walking toward him, asking Mata if Mata remembered him. According to Mata, Mata told Rivera that he did not want any trouble and that he started backing toward the house. Mata testified that, as he backed up, he bumped into Lazoya who pushed him into Rivera. Mata testified that all three men then attacked him, wrestling him to the ground where they hit, kicked and stomped him and pulled out clumps of his hair. Mata stated that he was afraid he was going to be hurt badly and, remembering he had a knife, got it out of his pocket and started swinging it in an attempt to get away.

■ In conducting a factual-sufficiency review of the evidence, due deference must be given the jury's assessment of the witnesses' credibility and their resolution of any conflicts in the evidence. *Jones*, slip op. at 4–5, at ————; *Clewis*, 922 S.W.2d at 133; *Desselles*, 934 S.W.2d at 878. These are the prerogatives of the jury as a fact-finding body, and we, as a reviewing court, may not preempt that role unless the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Jones*, slip op. at 4–5, at ————; *Clewis*, 922 S.W.2d at 135; *Hernandez*, at 512.

■ Considering all the evidence, both for and against the verdict, we conclude that

the evidence is factually sufficient to support the jury's rejection of Mata's self defense theory. Both Salazar and Lazoya testified that Mata was the first person to turn the conflict into a physical battle when he hit Rivera in the chest. Additionally, Salazar, Lazoya, Daisey Diaz, and Mata all testified that Mata was armed with a knife. Salazar and Lazoya also testified that Salazar and Rivera were neither armed with any weapon nor made any threats toward Mata. Furthermore, Dr. Peerwani testified that the stab wound which killed Rivera was consistent with a wound inflicted by a knife held in an overhanded manner and that Mata's wounds were not the wounds a person would sustain had he suffered a beating from three men.

Upon considering all the evidence, we find that the jury's rejection of Mata's self defense theory is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Jones,* slip op. at 4–5, at ———–———; *Clewis,* 922 S.W.2d at 135; *Hernandez,* at 512–13. Mata's sixth point is overruled.

 In his second point, Mata contends that section 8.04(a) of the Texas Penal Code is unconstitutional. TEX. PENAL CODE ANN. § 8.04(a) (Vernon 1994). Section 8.04(a) reads: "Voluntary intoxication does not constitute a defense to the commission of a crime." *Id.* Mata maintains that his constitutional right to due process of law was abridged by not allowing the jury to consider his voluntary intoxication as a defense. Mata relies upon the Montana Supreme Court case of *State v. Egelhoff* in support of his position. 272 Mont. 114, 900 P.2d 260 (1995). However, the United States Supreme Court reversed the Montana case and decided the issue adversely to Mata's position. *Montana v. Egelhoff,* —— U.S. ——, ——, 116 S.Ct. 2013, 2023, 135 L.Ed.2d 361 (1996); *see also Williams v. State,* 937 S.W.2d 479, 488 (Tex.Crim.App.1996). Mata's second point of error is overruled.

 In his third point, Mata argues the trial court's failure to follow the admonishments set forth in *Price v. State* regarding note-taking by jurors constituted an abuse of discretion as the requirements of *Price* are mandatory. 887 S.W.2d 949, 954–55 (Tex. Crim.App.1994).[5] He further contends that, even though no objection to the jurors' note-taking was lodged at trial, no objection was required in order to complain on appeal. The Court of Criminal Appeals has recently decided this issue contrary to Mata's position and held that, in order to preserve a complaint about jurors' note-taking, a timely objection must be made. *Shannon v. State,* 942 S.W.2d 591, 596 (Tex.Crim.App.1996); *see also* TEX.R.APP.P. 52(a). Consequently, because Mata did not object at any point during the trial to the jurors' note-taking, Mata has failed to preserve his complaint for our review. His third point is overruled.

 In his fourth point of error, Mata contends the State committed fundamental error when, during closing argument, the prosecutor improperly commented on Mata's opportunity to fabricate the events surrounding the stabbing of Rivera after listening to the other witnesses' testimonies. Mata admits that no objection was made at trial, but maintains that because the error was fundamental none was needed.

Classifying the right of a defendant not to be subjected to an incurable erroneous jury argument as a category-three right,[6] the

---

5. In *Price v. State,* 887 S.W.2d 949, 954–55 (Tex. Crim.App.1994), the Court of Criminal Appeals "suggested that the trial court [could] avoid any potential risks [of juror note-taking] by evaluating the jury's need to take notes in each case, informing the parties in advance that note-taking will be allowed, and carefully instructing the jury both at the time it is empaneled and in the jury charge." *Williams v. State,* 893 S.W.2d 549, 549–50 (Tex.Crim.App.1995).

6. The Court of Criminal Appeals has held that our justice system is composed of three distinct

categories of rules: "(1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request." *Marin v. State,* 851 S.W.2d 275, 279 (Tex.Crim.App.1993), *overruled in part by Matchett v. State,* 941 S.W.2d 922, 928–29 (Tex.Crim.App.1996) (holding that a harm analysis will be conducted on a case-by-case determination).

Court of Criminal Appeals has recently held that "a defendant's failure to object to a jury argument ... forfeits his right to complain about the argument on appeal." *Cockrell v. State,* 933 S.W.2d 73, 89 (Tex.Crim.App. 1996).

During closing argument, the State made the following statement:

He has had over two years to put his story together with his attorneys, and he has had the opportunity to sit here and hear every witness' testimony before he got up and told his tale.

As he concedes in his brief, Mata made no objection. Because Mata did not object to the alleged erroneous jury charge, he is foreclosed from asserting his complaint on appeal. *Id.* Mata's fourth point is overruled.

In his fifth point of error, Mata contends that error occurred when the trial court, pursuant to an answer by the jury to a special issue at punishment, entered a deadly weapon finding against him. Specifically, Mata complains that the affirmative finding of a deadly weapon should not have been entered because the State did not provide notice alleging that a *particular* instrument was used to cause death. We agree.

■■■■ A defendant is entitled to notice that the State will seek an affirmative finding that a deadly weapon was used during the commission of the charged crime. *Ex parte Brooks,* 847 S.W.2d 247, 248 (Tex.Crim.App. 1993); *Narron v. State,* 835 S.W.2d 642, 643 (Tex.Crim.App.1992); *Grettenberg v. State,* 790 S.W.2d 613, 614 (Tex.Crim.App.1990); *Ex parte Patterson,* 740 S.W.2d 766, 775 (Tex.Crim.App.1987), *overruled on other grounds by Ex parte Beck,* 769 S.W.2d 525, 528 (Tex.Crim.App.1989). Whereas an indictment is the logical place for such notice, the Court of Criminal Appeals has held that notice of the State's intention to seek an affirmative finding is proper as long as it is in writing. *See Luken v. State,* 780 S.W.2d 264, 266 (Tex.Crim.App.1989).

■■■■ Relying on *Narron,* the State would have us hold that implied notice of the State's intent to seek a deadly weapon finding con-

stitutes sufficient notice. The State maintains that, because the indictment alleged Mata killed Rivera by "stabbing" him, Mata was put on notice that the State was going to seek a deadly weapon finding because Mata would necessarily have used some object to stab Rivera.[7] Not only do we find the State's argument unpersuasive, our reading of *Narron* is that the Court of Criminal Appeals intended that for notice to be sufficient it must "specifically mention[ ] a particular object or substance and its use with respect to death or serious bodily injury." *Narron,* 835 S.W.2d at 643. Consequently, we hold that, because the State failed to specify the particular weapon used to stab Rivera, Mata did not receive sufficient notice. *See id.*

■■■■ Having determined that the trial court erred in entering an affirmative finding of a deadly weapon against Mata, we must now determine how the error affected the trial court's judgment and sentencing. Even where a deadly weapon special issue has been improperly submitted to the jury, a defendant's conviction and punishment will not necessarily be vitiated where the submission did not have an effect on the determination of guilt or the length of sentencing. *Patterson,* 740 S.W.2d at 778; *Hocutt v. State,* 927 S.W.2d 201, 204 (Tex.App.—Fort Worth 1996, pet. filed). In this case, as in *Hocutt,* the deadly weapon special issue could not have influenced the jury's determination on Mata's guilt because it was not read to the jury until after the jury had found Mata guilty of voluntary manslaughter. 927 S.W.2d at 204. However, unlike the court in *Hocutt,* we do not find that the improperly submitted deadly weapon special issue adversely affected the sentencing phase of Mata's trial. In *Hocutt,* the court analogized the improper deadly weapon special issue to an improper parole instruction and held that evidence in the record indicating that the jury found the instruction to be troublesome was sufficient to show that the defendant was harmed by the erroneously submitted issue. *Id.* at 205. Here, the rec-

---

7. The indictment charged Mata with intentionally and knowingly causing the death of Rivera by

"stabbing him" but did not specify any weapon used by Mata.

ord does not reflect that the jury was troubled by the deadly weapon special issue. Consequently, the judgment of the trial court will be reformed to delete (1) the recitation of the jury's answer to the improper deadly weapon special issue, and (2) the trial court's affirmative finding made therefrom. Mata's fifth point of error is sustained.

We affirm the trial court's judgment of guilt and reform the sentence, deleting the deadly weapon finding.

VANCE, J., concurs.

VANCE, Justice, concurring.

Although I join the Court's opinion, I write separately to urge the Court of Criminal Appeals to reexamine the standard of review adopted in *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996).

*Clewis* applies to a review of the factual sufficiency of the evidence to support the affirmative finding of the elements of the offense. Under the standard, a reviewing court "views all the evidence without the prism of 'in the light most favorable to the prosecution' ... [and] set[s] aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id.* My concern is whether the *Clewis* standard properly reflects the State's burden of proof at trial—beyond a reasonable doubt.

In setting the standard for reviewing the findings of fact on the elements of an offense, the *Clewis* opinion barely addresses an initial question which civil appellate lawyers describe as essential: Who had the burden of proof at trial? William V. Dorsaneo, III, 6 Texas Litigation Guide § 151.05[3][b][iii] (1996); W. Wendell Hall, *Revisiting Standards of Review in Civil Appeals*, 24 St. Mary's L.J. 1041, 1138–39 (1993); R. Orsinger, *Successful Challenges to Legal and Factual Sufficiency*, 1991 Advanced Civil Appellate Course, State Bar of Texas, N17–19; W. Wendell Hall, *Standards of Appellate Review in Civil Appeals*, 21 St. Mary's L.J. 865, 909–10 (1990); R. Townsend, W. Wendell Hall, & Madelyn DeWoody, *Standards of Review and Reversible Error*, 1990 Advanced Civil Appellate Course, State Bar of Texas, F21–

22; *see also* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.L.Rev. 515, 517–19 n. 7–11 (1991).

In civil cases, when an appellate court considers a "factually insufficient evidence" challenge, *asserted by the party who did not have the burden of proof at trial,* the reviewing court must consider and weigh all of the evidence in the case and set aside the verdict and remand the cause for a new trial if it concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Reversal can occur because the finding was based on weak or insufficient evidence or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof. William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.L.Rev. 515, 519 n. 11 (1991).

When an appellate court considers a "contrary to the weight and preponderance" challenge against a "failure to find," *asserted by the party who did have the burden of proof at trial,* the reviewing court may reverse and remand a case for a new trial when it concludes that the jury's "failure to find" is against the great weight and preponderance of the evidence. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex.1988).

It has been said that the difference in phrasing the formulations of the civil factual insufficiency standards is "merely semantical" and that the standards are "identical." *Clewis*, 876 S.W.2d 428, 432, 432 n. 10 (Tex. App.—Dallas 1994), *rev'd*, 922 S.W.2d 126. Indeed, the two propositions are often cited as one. *E.g., White v. Liberty Eylau ISD*, 920 S.W.2d 809, 813–14 (Tex.App.—Texarkana 1996, writ denied); *Ocean Transport, Inc. v. Greycas, Inc.*, 878 S.W.2d 256, 262–63 (Tex.App.—Corpus Christi 1994, writ denied); *Downen v. Texas Gulf Shrimp Co.*, 846 S.W.2d 506, 509 (Tex.App.—Corpus Christi 1993, writ denied). Even if the difference is semantical in civil cases, my view is that the difference is substantive in the

criminal context, because of the State's greater burden of proof at trial.

In the first criminal case to apply a factual-sufficiency review to the elements of an offense, the Austin Court rejected the factual-insufficiency test in favor of the against-the-great-weight-and-preponderance test because the former "does *not* import the preponderance-of-the-evidence burden of proof." *Stone v. State,* 823 S.W.2d 375, 381 (Tex. App.—Austin 1992, pet. ref'd, untimely filed). The *Clewis* opinion simply holds that the review standard enunciated in *Stone* correctly acknowledges the trial standard. *Clewis,* 922 S.W.2d at 129; *Stone,* 823 S.W.2d at 381. Neither opinion explains how. The Austin Court assessed the difference in the civil standards:

> A great-weight-and-preponderance point of error and a factually-insufficient-evidence point of error both challenge the factual sufficiency of the evidence, but by convention in civil cases, different names are used to identify which party had the burden of proof. When the jury gives an answer adverse to a party on an issue on which the party *did not* have the burden of proof, the jury finding is properly attacked by a factually-insufficient-evidence point of error. When the jury gives an answer adverse to a party on an issue on which the party *did* have the burden of proof, the jury finding is properly attacked by an against-the-great-weight-and-preponderance point of error. *See* Michol O'Connor, *Appealing Jury Findings,* 12 Hous.L.Rev. 65, 67 (1974). Technically, therefore, the criminal defendant would attack the jury's guilty verdict by means of a factually-insufficient-evidence point of error, although a failure to frame properly the point of error should not result in waiver. A criminal defendant properly attacks the jury's failure to find the elements of his affirmative defense by means of an against-the-great-weight-and-preponderance point of error. Because the criminal defendant's burden of proof on the affirmative defense is by a preponderance of the evidence, the phrasing of the point of error is logically

consistent with the underlying burden of proof, just as it is in a civil case.

*Stone,* 823 S.W.2d at 380–81.

The standard adopted by *Clewis* is the same standard enunciated in *Meraz v. State,* 785 S.W.2d 146 (Tex.Crim.App.1990). The *Meraz* standard is proper when a defendant challenges the jury's rejection of an affirmative defense *on which the defendant had the burden of proof* by a preponderance of the evidence. With respect to factual-sufficiency challenges by parties who had the burden of proof at trial, *Meraz* "harmonizes the criminal and civil jurisprudence of this State with regard to appellate review of questions of factual sufficiency." *Clewis,* 922 S.W.2d at 129. Why? Because under the *Meraz* standard, the question is: Was the finding contrary to the overwhelming weight of the evidence on the issue? In other words, did the jury, in order to convict the defendant, reject evidence in favor of the affirmative defense which outweighed the contrary evidence?

Conversely, when a defendant complains of factual insufficiency of the evidence to support the finding on the elements of the offense, on which the State had the burden, or, as here, a defense on which the State retains the burden, the reviewing court should not ask whether the weight of the evidence actually favored acquittal, as the *Clewis* standard suggests (was the verdict *contrary to the overwhelming weight of the evidence?* ). Rather, the court should ask whether the weight of the evidence is sufficient to reach the trial standard of beyond a reasonable doubt. This difference takes into account that evidence in favor of conviction could outweigh the contrary evidence and still be factually insufficient to satisfy the reasonable-doubt standard.

The correct formulation would ask whether a review of all the evidence, both for and against the finding, demonstrates that the finding of guilt is clearly wrong and unjust. Reversal for a new trial could occur because the finding was based on weak or insufficient evidence or because the proof of guilt, although adequate if taken alone, is offset by contrary proof to the extent that the reasonable-doubt standard is not satisfied.

One solution would be to recognize the burden of proof at trial in the statement of the review standard: *Given that the burden of proof at trial was beyond a reasonable doubt,* does a review of all of the evidence, both for and against the finding, demonstrate that the verdict is clearly wrong and unjust? Such a standard would recognize that the quantum of proof is greater in the criminal context.